[No. 41008-7-II.   Division Two.   June 7, 2012.]

FALINA HICKOK-KNIGHT, *Appellant*, v. WAL-MART STORES, INC., *Respondent*.

282

283

Thomas J. West (of *Krilich Laporte West & Lockner PS*), for appellant.

*Bert W. Markovich* and *Colin J. Folawn* (of *Schwabe Williamson & Wyatt PC*), for respondent.

¶1 HUNT, J. — Falina Hickok-Knight appeals the jury's $6,433.35 award to her of damages against Wal-Mart Stores Inc., the trial court's $5,526.17 costs award to Wal-Mart (based on her damages award being less than Wal-Mart's settlement offer), and the trial court's denial of her motion for a new trial. Hickok-Knight argues that the trial court (1) erroneously allowed (a) the jurors to touch her feet during her direct examination to gauge their relative temperatures, (b) expert witnesses to testify about her medical, mental health, and social histories, and (c) Wal-Mart's expert psychiatric witness to testify about her medical, mental health, and social histories; (2) violated the appearance of fairness doctrine; (3) erred in refusing to give her requested jury instructions about aggravating and "lighting up" preexisting conditions; and (4) erroneously awarded Wal-Mart costs incurred *before* its offer of judgment. We vacate the trial court's costs award to Wal-Mart and remand with instructions for the trial court to award Wal-Mart only those costs it incurred *after* it made its offer of judgment to Hickok-Knight. We otherwise affirm.

## FACTS

### I. BACKGROUND

#### A. Hickok-Knight's Foot Injury at Wal-Mart

¶2 After shopping at a Wal-Mart Store on June 24, 2006, Falina Hickok-Knight was returning her shopping cart in the parking lot when a forklift driven by a Wal-Mart employee collided with a row of other shopping carts that hit Hickok-Knight's cart, causing it to hit, run over, and stop on top of the middle of her left foot. She limped back to her car, called Wal-Mart to report the incident and spoke with an assistant manager, drove to her parents' house, iced her foot, and then drove with her father back to Wal-Mart, where they spoke with a manager and filled out a "customer incident statement." 1 Verbatim Report of Proceedings (VRP) at 278; Ex. 61. Hickok-Knight did not seek medical attention that day.

¶3 The next day, Hickok-Knight went to an emergency room and had her foot x-rayed; the results were "normal" and showed no fracture. 2 VRP at 284-85. Her medical records showed that she had "minimal swelling" and "no discoloration."[1] 7 VRP at 1189-90. Two days after her injury, Hickok-Knight saw (1) a physician's assistant, who "found a little swelling on the top of the foot" and diagnosed her with "foot pain"; and (2) a podiatrist, Dr. Gavin Smith, who performed a computed tomography (CT) scan (which turned up "normal" and showed that Hickok-Knight did not have any broken bones or damaged tendons or muscles), diagnosed a "foot bruise," and referred her to a physical therapist. 2 VRP at 285-86, 335; Ex. 2.

¶4 The next month, Hickok-Knight underwent physical therapy. At some point, she also underwent magnetic reso-

---

[1] According to Hickok-Knight, however, the emergency room staff "diagnosed" a bruise on her left foot. 2 VRP at 285-86.

nance imaging (MRI), the results of which were "normal." 7 VRP at 1191. On September 22, she again saw Dr. Smith, who "found that there was no swelling, no redness, [and] no skin changes" and opined that Hickok-Knight "had idiopathic foot pain," which, according to Hickok-Knight, meant that Dr. Smith "didn't know what was the matter." 7 VRP at 1193.

¶5 In October, Dr. Smith referred Hickok-Knight to Dr. David Judish, who took a "long history" from Hickok-Knight, conducted an "[electromyogram] and nerve conduction studies," diagnosed her with depression, and prescribed an antidepressant. 2 VRP at 316-17. Dr. Judish also noticed that when Hickok-Knight was distracted, she did not react when he touched her injured foot; he ruled out a diagnosis of complex regional pain syndrome (CRPS).[2] This was the last time for over a year that Hickok-Knight visited a care provider specifically for her foot injury.[3]

## B. Hickok-Knight's Work History

¶6 Before injuring her foot, Hickok-Knight had worked (1) as a sales clerk at Benjamin Franklin for two months in 2001; (2) in a Wal-Mart position from May 2003 through September 2005 at $10.29 an hour; and (3) as a dental assistant from September 2005 to April 2006 at $12.00 an hour, from which she was fired, two months before her foot injury.

¶7 Hickok-Knight returned to the workforce around the time that she stopped seeing care providers about her foot.

---

[2] CRPS (formerly known as "reflex sympathetic dystrophy" or "RSD") is a "chronic pain state, usually preceded with some type of trauma." 2 VRP at 335, 417. CRPS sufferers have a "wide spectrum of symptoms." 3 VRP at 449. Some patients have "severe, pretty much obvious, daily signs of CRPS"; others may have symptoms that "come and go." 3 VRP at 449.

[3] From October 2006 through November 2007, Hickok-Knight saw a physician's assistant four times. Hickok-Knight also had five telephone conversations with her physician. During none of these visits or conversations did she mention any foot pain.

From October 2006 to April 2007, she worked for a jewelry retailer, where she sometimes used a cane and sat down frequently. Hickok-Knight left her jewelry retailer job to work as a dental assistant for a different dental office for three months until she was terminated (because "[a]fter 3 month[s] of train[ing], [Hickok-Knight] was not understanding full [patient] care. Her chart notes were very unclear."). Ex. 60. In August 2007, she returned to work for the same jewelry retailer, where she used a cane and sat down frequently. In March 2008, Hickok-Knight again stopped working for the jewelry retailer. After that, she did not return to the workforce.

## II. HICKOK-KNIGHT'S CONTINUING MEDICAL TREATMENT

### A. Dr. Smith (Hickok-Knight's Podiatrist)

¶8 After filing her lawsuit, Hickok-Knight returned to her podiatrist, Dr. Smith, complaining about pain in her left foot. Dr. Smith, however, (1) "said there was no redness or temperature changes, no skin or nail changes, no swelling," (2) opined that Hickok-Knight possibly was suffering from CRPS, (3) advised her to research CRPS on the Internet, (4) referred her for a three-phase bone scan, and (5) referred her to Dr. Long Vu, an osteopathic doctor. 2 VRP at 338; 3 VRP at 411, 413; 7 VRP at 1205. Hickok-Knight's December 2007 three-phase bone scan indicated "[m]inimally decreased blood flow of perfusion to the left foot compared to the right is suggestive of [CRPS]." 3 VRP at 428; 7 VRP at 1201-02; Ex. 8.

### B. Dr. Vu (Hickok-Knight's Osteopath)

¶9 When Hickok-Knight saw Dr. Vu for the first time on February 2, 2008, she complained about pain spreading up her leg to her groin and constant aching, burning, throbbing, shooting, and sharp pain. Dr. Vu (1) observed some discoloration on Hickok-Knight's left foot, as well as

allodynia;[4] (2) documented that one of Hickok-Knight's feet was "significantly colder than the other foot when [he] touched it"; (3) found the three-phase bone scan results to be "consistent with CRPS"; (4) diagnosed Hickok-Knight with CRPS[5]; and (5) prescribed medication to alleviate her pain and to help her sleep. 8 VRP at 427, 433; Ex. 5.

¶10 On February 13, Dr. Vu performed on Hickok-Knight a "sympathetic block," which applied local anesthetic to nerves through a spinal injection and "worked to increase blood flow to the . . . foot." 3 VRP at 439. At first, there was "significant pain relief," but the effects "slowly wore off." III VRP at 440, 442. On February 21, Hickok-Knight returned for a second sympathetic block, which produced similarly effective, but temporary, results. On March 10, Dr. Vu also used a needle to perform "neurolysis of the sympathetic chain," a procedure known as "sympathetomy" or "radio ablation"; this procedure involves "cauterizing" nerves in Hickok-Knight's spine with "radiofrequency" and "disrupts the signal transmission along that chain at that level . . . giving it a more permanent response; a more long-acting" treatment. 3 VRP at 447, 486; Ex. 5. After this procedure, Hickok-Knight's "temperature difference seemed to . . .

---

[4] "Allodynia," which may accompany CRPS, is "the sensation of pain from a stimulus that is typically not painful." 3 VRP at 419. Dr. Vu observed that, if he touched Hickok-Knight's foot when she was "distracted," she would not complain of pain, similar to Dr. Judish's October 2006 observations. 3 VRP at 493-94; 7 VRP at 1195.

[5] Dr. John Loeser, Hickok-Knight's expert witness, later described "CRPS" as

an altered function in a region of the spinal cord that produces a variety of signs and symptoms in an extremity or sometimes more than one extremity, but there is no anatomic pathology; meaning, there's nothing you can see by looking at somebody that says there's something wrong here. There's no tumor or infection or growth of any sort. It's an alteration in the way the spinal cord functions that produces the pain and the other signs and symptoms that patients with CRPS will have.

4 VRP at 538. CRPS diagnosis criteria include (1) "severe pain that is persistent well beyond the initial recovery period"; and (2) "skin changes" and changes in "nail growth," "hair growth," "muscle bulk," and "blood supply." 3 VRP at 417-18. In the "acute phase," an extremity may be "warm" or "hot"; chronic CRPS may result in a "cold extremity." 3 VRP at 418. CRPS can also cause "color changes and swelling." 3 VRP at 418.

improve," "so the foot didn't seem to feel as cold to her"; this increase in temperature "persisted." 3 VRP at 447-48.

## C. Dr. Wray (Wal-Mart's Expert Neurologist)

¶11 A few weeks later, on March 28, Hickok-Knight saw Dr. Linda Wray, a neurologist whom Wal-Mart hired to conduct an independent medical examination of Hickok-Knight. Hickok-Knight complained to Dr. Wray about "a lot of pain and all kinds of problems," displayed "very dramatic limp," and "would barely put her left foot down on the floor" or "bear weight on it." 5 VRP at 736; 7 VRP at 1208. After completing the examination, Dr. Wray concluded that Hickok-Knight did not suffer from CRPS.

¶12 Two months after Dr. Wray's examination, on June 2, Wal-Mart's surveillance video showed Hickok-Knight filling up her vehicle with gas without any apparent impairment to her walking. Similarly, a June 14 surveillance video[6] showed Hickok-Knight, without any obvious physical impairment, burying a dead animal in her front yard and shopping at the Wal-Mart where she had suffered her foot injury, pushing a shopping cart down the aisle, walking without pushing the cart, and loading groceries into a vehicle. And a July 7 surveillance video showed Hickok-Knight walking without obvious impairment.

## D. Return to Dr. Vu

¶13 On September 30, Dr. Vu discussed these surveillance videos with Hickok-Knight. Based on these videos, Dr. Vu did not want to proceed with a "spinal cord stimulator trial," which would have involved threading an electrode wire into her spinal column and connecting the wire to a box that Hickok-Knight would have worn outside her body to provide electrical stimulation to her spinal cord. 8 VRP at 1221. Instead, Dr. Vu encouraged Hickok-Knight to follow

---

[6] Wal-Mart apparently hired investigators to take these surveillance videos.

up with a pain clinic. Instead of attending a pain clinic, however, Hickok-Knight returned to Dr. Vu a month later, on November 5, continuing to complain about pain in her left foot. After this appointment, Dr. Vu noted, "Though [Hickok-Knight] has . . . hypersensitivity to exam, she does not meet other criteria for CRPS." Ex. 57. Dr. Vu again suggested that Hickok-Knight follow up at a pain clinic.

E. Dr. Silver (Pain Clinic Psychologist); Return to Dr. Vu

¶14 In December, Dr. Frederick Silver, a psychologist at Franciscan Chronic Pain Management to which Dr. Vu had referred Hickok-Knight, evaluated her preadmission. Dr. Silver's "[d]iagnostic impression" was that Hickok-Knight suffered from "[p]ain disorder with depression, anxiety and [CRPS]" and "[a]djustment disorder with mixed anxiety and depressed mood versus dysthymic disorder."[7] Ex. 9. The pain clinic admitted Hickok-Knight on March 2, 2009, and discharged her one or two months later.

¶15 In May, Dr. Vu asked Dr. Silver to perform a follow-up "psychological analysis" of Hickok-Knight to determine whether she was a candidate for a spinal cord stimulator trial. 7 VRP at 1093. Dr. Silver "thought" that Hickok-Knight "could cope with the procedure" but "that her depression should be addressed to maximize the outcome of the stimulator trial." 7 VRP at 1093-94.

¶16 On June 25, Hickok-Knight saw Dr. Vu again, continuing to complain about "shooting, throbbing, achey" pain in her left foot. Ex. 48. Based on Dr. Silver's follow-up evaluation, Dr. Vu recommended that Hickok-Knight undergo the stimulator trial. But less than two months after seeing Dr. Vu, again complaining about foot pain, Wal-Mart's August 19 surveillance tape showed Hickok-Knight walking to and from a vehicle, carrying several bags of

---

[7] "Dysthymic disorder" is "a low level, long-term, chronic depression, or an adjustment disorder with mixed anxiety and depressed mood." 7 VRP at 1092.

groceries, and placing those groceries in a vehicle's trunk, all without apparent difficulty.

¶17 Eight months later, on March 31, 2010, Hickok-Knight underwent the spinal cord stimulator trial. The stimulator trial failed, medically speaking, because Hickok-Knight asserted that it did not provide enough pain relief.

## III. Procedure

¶18 Hickok-Knight sued Wal-Mart, asserting that (1) a Wal-Mart employee, acting within the scope of employment, had "negligently performed his duties and as a result, caused a serious injury to the plaintiff"; and (2) Wal-Mart had negligently trained and supervised that employee, and "was otherwise negligent in the operation of the store." Clerk's Papers (CP) at 1-2. Hickok-Knight sought damages for medical expenses, income loss, and pain and suffering.

### A. Partial Summary Judgment; Offer of Judgment

¶19 The superior court granted Hickok-Knight's partial summary judgment motion, concluding that (1) Wal-Mart was liable for the June 24, 2006 incident; (2) there was no comparative fault by Hickok-Knight; and (3) "the sole issue at trial will be the causation, nature and extent of plaintiff's injuries and damages." CP at 18. In October 2009, Wal-Mart made an offer of judgment to Hickok-Knight for $30,000. Refusing the offer, Hickok-Knight elected to go to trial.

### B. Pretrial Rulings

¶20 In a pretrial hearing on April 12, 2010, Wal-Mart argued that Hickok-Knight's medical and social histories were relevant and therefore, admissible, to show that "she does not have RSD [(reflex sympathetic dystrophy)] or [CRPS]" and that "[e]ither there's something going on psy-

chologically or she's faking it."[8] 1 VRP at 5-6. Disagreeing, the trial court ruled, "Any reference to [Hickok-Knight's] prior physical or emotional health is not admissible." 1 VRP at 12.

¶21 Further elaborating on its ruling, the trial court explained that the jury had to make only one of two findings: (1) either Hickok-Knight "matches the criteria" for CRPS; or (2) "she doesn't match it." 1 VRP at 13. Wal-Mart argued that the jury could make a third finding—that Hickok-Knight believes she suffers from the injury, but that her injury is "psychosomatic," namely that she suffers "distress and emotional pain" but "report[s] it as physical pain." 1 VRP at 24. The trial court rejected this argument, stating, "[L]egally in this case, [the jury] either find[s] it's a valid condition and she has it or that she doesn't; and why she doesn't, the jury isn't going to care about that." 1 VRP at 24.

## C. Trial Testimony

### 1. Marcia Hickok-Ritchie's testimony

¶22 Hickok-Knight's sister, Marcia Hickok-Ritchie,[9] testified that (1) after Hickok-Knight injured her foot, she

---

[8] Wal-Mart's theory was that

[Hickok-Knight] suffered a bruised foot in the accident at Wal-Mart and that she does not have RSD or [CRPS]; so if she doesn't have [them,] what explains her subjective complaints of chronic pain? . . . Either there's something going on psychologically or she's faking it.

. . . .

Essentially, [Hickok-Knight] expresses a social stressor—stressors and anxiety in her life as subjective complaints of pain. These certain things are relevant, i.e., her conditions and her social stressors, the fact she's a divorced, single mother that's in debt. . . . [T]he background of some of these other medical conditions are also absolutely relevant of what she sought treatment for in the past; but part of hysteroid personality characteristics—you know, a different and I guess dumbed-down version of saying that is that it's hypochondria.

1 VRP at 5-7.

[9] To avoid confusion, we refer to Marcia Hickok-Ritchie simply as "Marcia." We intend no disrespect.

would "freak out and start crying" whenever someone "barely touch[ed] her leg"; (2) she observed "discoloration" on the top of her sister's foot; and (3) "[y]ou can touch one foot and feel how warm it is and then touch the other one, and it's freezing. It's like she has no circulation in it." 1 VRP at 135, 141. When Hickok-Knight's counsel asked, "[I]s that coldness there all the time[?]" Marcia responded, "[T]he coldness is always there." 1 VRP at 141.

### 2. Hickok-Knight's testimony; jury's observation and touching her feet

¶23 Hickok-Knight testified that (1) her pain was "constant" and "shooting" and "tingling in the left foot that travels through [her] leg and into [her] buttocks"; (2) she would experience "burning sensations in [her] foot" and sometimes would be "completely immobilize[d]"; and (3) her foot had started to change color that morning, the second day of her direct examination. 2 VRP at 189, 212. Hickok-Knight's counsel asked the trial court for permission "to show the jury [Hickok-Knight's injured] foot compared to her other foot; so [it] could look at it and actually see what's happening." 2 VRP at 212. The trial court agreed and ordered the jury to walk over to Hickok-Knight to look at her feet. The jury then visually examined Hickok-Knight's left foot.

¶24 When direct examination resumed, Hickok-Knight testified that (1) after the injury, her left foot "went really cold" and "was like ice always"; (2) the nerve ablation procedure that Dr. Vu performed in March 2008 had "brought back heat" to her left foot; but (3) since then, "the cold has returned; but it's not constant like it was before. It is off and on." 2 VRP at 233. Hickok-Knight's counsel then asked, "[J]ust as you've been sitting here, has your foot color changed? Is it getting more pronounced?" Hickok-Knight replied, "Yes. I believe it is." 2 VRP at 250. When counsel asked her to describe the progression of the change in her foot color, Hickok-Knight replied:

My skin is blotching, mottled. As my foot—the pain increases, the blotching increases. The redness will increase. I have whiteness on my foot, like somebody pushed on their foot and you, you know, lose the blood in that area; so that's what it looks like. It starts to swell more.

2 VRP at 250-51.

¶25 Wal-Mart asked to voir dire Hickok-Knight about her foot's color change, stating, "I'd like to ask her some questions. I'd like the jury to look at her foot to see if they see the change" since the jury's previous visual inspection that had occurred minutes earlier. 2 VRP at 251. The trial court responded, "Well, ultimately, it is [a] jury question as to whether or not the foot is colored or changing; so if you feel, based on this testimony, that they need to take a look at the foot as it is right now, then we'll do that." 2 VRP at 251. When a juror asked, "Can I touch those feet if I want?" the trial court replied, "Well, we'll take that up after the morning recess." 2 VRP at 251-52.

¶26 After recess, outside the jury's presence, the trial court stated, "[T]here's testimony that if there's different temperatures between the feet, I assume that [the juror] wants to see that for herself." 2 VRP at 251-52. Hickok-Knight replied:

Yeah. I guess she does. What my client said was that the temperature changes occur from time to time. They're not there all the time, but I guess my concern is more the pain that my client feels when people touch her foot; so I don't mind them looking, but I don't know if I want somebody—especially one juror—diagnosing something.

2 VRP at 253. The trial court stated, "Well, they all [the jurors] may wish to touch it." 2 VRP at 253. Hickok-Knight's counsel responded, "Well, I don't know that I want all of them touching her. Okay. I don't think that's appropriate." 2 VRP at 253.

¶27 The trial court stated, "Juror No. 7 has an interest because of the testimony regarding temperature differ-

ences. I mean, it's an issue." 2 VRP at 253. Hickok-Knight replied:

> It's not an issue for the purpose of touching the foot and finding out if it's an issue because my client has already—now, if she said something like it's always cold compared to the other one, that would be one thing. I think the one thing she did say that made it clear to all the jurors, and presumably everyone in the courtroom here, is that after she had the nerve ablation [procedure], the one thing that it did take care of for a good period of time was the cold versus hot; and now it only happens occasionally where it's cold and not hot, so I don't want the jury touching her for that reason. There's no good reason to do it, given her testimony; and I'm not going to have 12 people coming up and touching my client's foot when it's ultra sensitive. There's just no reason to do it.

2 VRP at 253-54.

¶28 The trial court ruled:

> Well, Counsel, I've heard enough. All right. I'm going to allow whatever jurors wish to compare the relative temperatures of the two feet to go ahead and do so.
>
> . . . .
>
> I can understand [why Hickok-Knight does not want the jurors to touch her foot]. She says it's very, very, very painful. We also do have, however, when we get there, the medical testimony which indicates that when she's distracted, she doesn't feel pain; but, I mean, you know, given the fact that it's an issue in this case, I'm going to allow whichever members of the jury wish to touch the foot to touch the foot.

2 VRP at 256.

¶29 Hickok-Knight further argued:

> If the ruling of the Court is that my client's foot be touched by whatever juror wants to do it . . . then, if some other jurors don't want to do it, then what you have is evidence that some jurors have but other jurors don't; and then they're going to be relying on those jurors; so either none or all of the jurors would, otherwise, have to touch my client's foot.

2 VRP at 257. The trial court agreed, ruling, "[I]t will have to be all the jurors." 2 VRP at 257.

¶30 The trial court then clarified that it would instruct the jurors to "lightly place their hands on top of the foot and the other foot" and not to "grab," to "squeeze," or to "press" Hickok-Knight's foot. 2 VRP at 258. Hickok-Knight's counsel reiterated his objection, to which the trial court stated:

> I understand that, Counsel; but, you know, once—I mean, a lawsuit has been filed. One juror feels that she, you know, as a trier of fact, wants to—I mean, it has been an issue. I mean, the testimony has been that the temperature changes sometimes do accompany these discolorations; and it's—you know, at least from my recollection, she's been a little contradictory about when it does and when it doesn't; so if that's what they want to do, I'm going to let them do it.

2 VRP at 259.

¶31 Hickok-Knight's counsel asked the trial court, "[H]ow do we handle my client's pain if she is in pain or if somebody touches it too hard? Do we stop, or do we just keep going?" 2 VRP at 259. The trial court reiterated that it would instruct the jury not to grab, to squeeze, to press, or to hold the foot, and stated, "I don't think that the jury is going to be doing anything; and, you know, if there's pain, you know, we'll deal with it." 2 VRP at 259. The trial court then instructed the jury to touch Hickok-Knight's feet. Hickok-Knight later testified that the jurors' touching her left foot "was like a knife being dr[iven] through [her] foot." 2 VRP at 268.

### 3. Dr. Vu

¶32 Dr. Vu, Hickok-Knight's treating osteopathic doctor, testified as an expert witness substantially as set forth in the previous section of this opinion. During his testimony, Hickok-Knight's counsel interjected, "[R]ecently, my client was ordered to submit to touching by the jury, albeit light touch. Of course, the jury didn't know what the situation

was; and they touched my client's feet." 3 VRP at 421. Wal-Mart objected. After excusing the jury, the trial court asked Hickok-Knight, "Counsel, where are we going with this?" Hickok-Knight replied, "Well, I want the jury to understand that when my client reacted the way she did, there was a reason for it. It's very simple." 3 VRP at 422. The trial court responded:

> Counsel, [Dr. Vu] wasn't here when we did the test stroking last week. We haven't even established whether or not she suffers from the touch, or which kind of allodynia she suffers from. You haven't gotten into his treatment or diagnosis with her; and you're asking him now to comment on something that occurred outside his presence, you know. I'm going to sustain the objection. I don't think we're going anywhere with this.

3 VRP at 422.

¶33 Subsequently, in response to Hickok-Knight's asking Dr. Vu what, "on a more probable than not basis," caused Hickok-Knight's CRPS, Dr. Vu replied, "[T]he initial injury," and that he did not have "any documentation that there was chronic pain before this incident." 3 VRP at 459. Dr. Vu also testified, however, that (1) he performed the sympathetic blocks and radio ablation intervention techniques in February and March 2008, *before* he saw Wal-Mart's June and July 2008 surveillance videos of Hickok-Knight; and (2) he would not have performed these intervention techniques if he had seen such videos beforehand because in the videos, Hickok-Knight appeared to have "a high enough level of function" that the risks involved with the intervention techniques would have outweighed the potential gains. 3 VRP at 477-78.

### 4. Economic loss: vocational rehabilitation expert

¶34 Hickok-Knight called a vocational rehabilitation expert and an economist to prove the economic loss from her foot injury. The vocational rehabilitation expert testified that Hickok-Knight would be unable to work as a dental

assistant because of the "continuous standing" involved, so the only position she could hold would be an "office-type job." VRP (Apr. 15, 19, 2010) at 10. The vocational rehabilitation expert opined, however, that Hickok-Knight lacked the requisite skills for an office job.

¶35 Based on the vocational rehabilitation expert's assessment of Hickok-Knight's ability to work, the economist testified that $233,852 represented the amount of lifetime earning capacity that Hickok-Knight would lose if she could work only as a medical office assistant instead of as a dental assistant. The economist also explained that if Hickok-Knight were totally unemployable and unable to perform household services, then $1,372,118 represented her loss of earning capacity and her cost of household services.

### 5. Dr. Loeser

¶36 Before Hickok-Knight called her next expert witness, Dr. John Loeser, Wal-Mart again argued for admission of her medical and social histories because Wal-Mart's theory of the case was that Hickok-Knight has "psychosomatic problems." 4 VRP at 508. Hickok-Knight objected.

¶37 Reversing its pretrial ruling, the trial court concluded:

> I think, under the circumstances, that [Wal-Mart] is entitled to cross-examine Dr. Loeser as to whether or not he considered [Hickok-Knight's medical and social histories] in making his opinion.
>
> . . . .
>
> I think in formulating a medical opinion regarding whether or not she's got CRPS, you know, I mean, they are entitled to go into the extent of his knowledge regarding her prior medical history. There may be things that do tend to support Dr. [John] Hamm's [Wal-Mart's expert psychiatrist witness who testified later in the trial] conclusion that, you know, she may well have this somatization disorder. I don't know. Ultimately, that's the

jury's decision; but I think the jury is entitled to know what the basis of Dr. Loeser's opinion is.

4 VRP at 527-28.

¶38 Hickok-Knight responded, "Well, I've already told you that based on your [pretrial] rulings here [that excluded evidence of Hickok-Knight's medical and social histories], I've already told [Dr. Loeser] not to talk about any of that." 4 VRP at 529. Hickok-Knight then conferred with Dr. Loeser and informed the trial court, "[A]ctually, I was wrong. Dr. Loeser, I believe, did see all [of Hickok-Knight's] medical records. We did send him everything [we] received, so he looked at them." 4 VRP at 529.

¶39 Dr. Loeser, a professor of neurological surgery and anesthesiology and Hickok-Knight's expert witness, had reviewed Hickok-Knight's medical records, as well as "the depositions of other physicians that included a review of all of her prior history before the accident that injured her foot," and the report of Dr. Hamm, Wal-Mart's expert witness and the psychiatrist and who had evaluated Hickok-Knight in person before trial, which "lists a number of things that happened to [Hickok-Knight] in her youth and up through the time that she was an adult." 4 VRP at 542, 544, 4 VRP at 547; 5 VRP at 861. Dr. Loeser himself, however, had not physically examined, interviewed, or performed any tests on Hickok-Knight. Based on her records alone, Dr. Loeser testified that Hickok-Knight "has an absolutely classic, typical case of CRPS in all respects" that "was caused by the trauma to her foot that occurred when her foot was struck by a shopping cart."[10] 4 VRP at 542-44.

---

[10] Dr. Loeser also testified, "Headaches are every bit as murky as CRPS" and further explained:

[CRPS] is not a psychiatric or psychological condition. It is a medical condition whose mechanism of ideology we don't understand completely, but we don't understand headaches either; and it's a "there" medical condition. There are lots of things physicians aren't smart enough to understand, but that's not a reason for labeling something psychiatric.

4 VRP at 550, 560-61.

¶40 On cross-examination, Dr. Loeser testified that treating a patient involves obtaining the patient's medical history and, consequently, he agreed that it was "valuable" to look at Hickok-Knight's medical history. 4 VRP at 595-96, 598. Using Dr. Hamm's report, Wal-Mart asked Dr. Loeser questions about Hickok-Knight's history: For example, Wal-Mart asked whether he was aware that (1) Hickok-Knight had supposedly feigned seizures when she was 12 years old; and (2) when she was 15 years old, she had complained of "fe[eling] like her kneecap popped out" but that a subsequent examination revealed no injury. 4 VRP at 596-97. Dr. Loeser stated that he was aware of this part of Hickok-Knight's medical history. Hickok-Knight objected during this line of questioning, but the trial court disagreed, ruling, "Well, it's a medical record that was reviewed; and to the extent that he reviewed it, you can ask him questions regarding it." 4 VRP at 598. Wal-Mart then asked Dr. Loeser whether he was aware that "since she was 18 years old, [Hickok-Knight had] visited the emergency room six times." 4 VRP at 599. Dr. Loeser testified that he was also aware of this.

### 6. Dr. Wray

¶41 Wal-Mart's expert neurologist witness, Dr. Wray, testified that she had reviewed Hickok-Knight's recent medical records, interviewed Hickok-Knight, had taken "a general medical history in terms of other illnesses and injuries she might have had," and had "carried out a detailed neurologic exam." 5 VRP at 706-07. Dr. Wray testified that, based on a "reasonable degree of medical probability," (1) her medical opinion was that "Hickok-Knight suffered a minor bruise to her foot as a result of the shopping cart rolling over it at Wal-Mart, that that had healed, and that there was no diagnosable condition after that"; (2) "[she] did not feel that [Hickok-Knight] fit the criteria for a diagnosis of CRPS, and [her] opinion is that that condition is fairly controversial and unclear in any

case"; (3) she did not see "any physical basis or objective basis to say that [Hickok-Knight] is not able to work"; and (4) Hickok-Knight should in fact return to work because "[r]eturning to normal daily activities, including work, is a very important part of rehabilitating and recovering from injuries of various types, including chronic pain conditions." 5 VRP at 707-08, 752.

### 7. Dr. Hamm

¶42 Wal-Mart's expert psychiatric witness, Dr. Hamm, testified that he had conducted a "records review" of Hickok-Knight's medical records from when she was "about age ten or so, onwards through more recently, 2010." 5 VRP at 867. Dr. Hamm had also reviewed Hickok-Knight's 2006 deposition testimony and Dr. Silver's "psychological records . . . and his testing" of Hickok-Knight from her time at the pain clinic. 5 VRP at 867. Dr. Hamm explained that psychiatrists rely on medical records, not only to "see what medical problems people have had," but also to see "how they adapt to [them], how they respond to [them], how they use the medical care system, what kind of complaints or difficulties they've had . . . that's important to me as a psychiatrist in understanding an individual." 5 VRP at 867.

¶43 Dr. Hamm testified that he had diagnosed Hickok-Knight with "somatoform pain disorder," also known as "pain disorder [with] psychological factors." 6 VRP at 868. He explained:

> My opinion is that Hickok-Knight does have what is termed as psychological based pain disorder, sometimes called somatoform or just a pain disorder based on psychological factors; and the ideology or cause of this is, basically, her underlying personality characteristics, the way she copes with things. Also, she has multiple stressors in her life that cause some difficulty for her that, I think, are independent of anything that happened on June 24, 2006.
>
> My opinion is that she tends to minimize these other problems that she's had and focuses on this Ju[ne] 2006 incident as being the cause of the problems.

5 VRP at 868. Dr. Hamm further explained that "a lot of factors" went into that diagnosis, including "her life history" and "medical history":

> [Hickok-Knight] utilizes denial which is pushing things out of mind, particularly stressful things. She is expressing what I call emotional pain or emotional distress physically as pain, a—what's called somatization process. . . . I think that's—is going on [with Hickok-Knight].

6 VRP at 889-90.

¶44 Dr. Hamm then testified about "chronologically, some of the things that [Hickok-Knight's] had since childhood": (1) When Hickok-Knight was 10 years old, she had complained of back pain, went to the hospital, "there [was not] that much wrong with her," and her response was "dramatic"; (2) Hickok-Knight had "responded in an excessive way" to some illnesses; (3) Hickok-Knight had dyslexia in grade school and "kids were mean to her"; (4) Hickok-Knight had "fake[d]" a seizure when she was 12 years old because she "didn't want to go to school"; (5) Hickok-Knight was raped when she was 13; (6) in her adolescence, Hickok-Knight had experienced "menstrual irregularities" and "abdominal discomfort," and was diagnosed with a "possible ovarian cyst"; and (7) after learning that a friend's mother had meningitis, Hickok-Knight had gone to the emergency room because she was worried that she, too, had meningitis. 6 VRP at 896-900.

¶45 When Wal-Mart asked Dr. Hamm to consider "another hypothetical based on preexisting interactions with the health care system:"

> I'd like you to consider that on January 4th of 1995, [Hickok-Knight] came to the emergency room in an ambulance and was complaining of severe knee pain and complaining to the doctor it felt like her kneecap had popped out. There was no swelling, and the kneecap was normal, and the x-rays were normal. She claims that she fell on April 2nd of 1996. She was about 17 years old, at this time, and—16 or 17, and she went to [the

hospital]. X-rays were normal. She went to the ER on August 28th of '97, about 18 years old, complained of severe left abdominal pain.

She, in 2002, had a couple of psychiatric examinations that involved the separation of divorce with her husband. She was divorced in 2003. She started work at Wal-Mart on April 23rd of 2003; and about five weeks later, on May 30th of 2003, she was lifting a can of Power Bait, felt her shoulder pop, was off work for five and a half months, went back to light duty, transferred back to sporting goods after that, had a chronic pain situation, and doctors were talking about pain clinics and so forth, eventually had arthroscopic surgery on 10/15/04, went to the ER again with a sore throat on 01/11/05; and on 03/15/05—let's see, she would be about—03/15/05, she'd be about 24 years old, 23 years old, claims that she injured the back of her leg when a toilet seat broke, had a one-centimeter abrasion, no bleeding.

[T]his is on 12/30/07. This is just before she saw Dr. Vu and started complaining of pain running up and down her leg. She complained—went to the ER and was complaining of stabbing chest pains, nine on a scale of zero to ten; and she was given a narcotic cocktail.

Based on that hypothetical and that scenario of information of interactions with the health care system and based on your review of her records and the history that you took, do you have an opinion as to the significant of that?

6 VRP at 901-03. Dr. Hamm replied, "[T]hat's representative of somebody who does overrespond to sensations in their body. [T]hese are the kind[s] of things in the background of this woman that would support my diagnosis of pain disorder." 6 VRP at 903. Dr. Hamm further testified that Hickok-Knight "has a psychological borne problem" and is "fully capable of work[ing]." 6 VRP at 931-32.

### 8. Dr. Silver

¶46 Dr. Silver, the pain clinic's psychologist and Hickok-Knight's expert witness, opined that Hickok-Knight's social history was "significant" because "the extent of someone's

stress and their coping skills affects how vulnerable they are to pain and affects their ability to adjust and cope with pain." 7 VRP at 1168. Dr. Silver also agreed that it is "very important" to learn about Hickok-Knight's "psychological, traumatic life experiences that have impacted" her. 7 VRP at 1119. Dr. Silver then explained that Dr. Hamm's diagnosis of "pain disorder with . . . psychological factors" was caused by "her injury and the pain that she experienced afterwards and the [CRPS] or, you know, whatever pain syndrome ends up being diagnosed." 6 VRP at 886; 7 VRP at 1110.

### D. Jury Instructions

### 1. Earning capacity

¶47 Hickok-Knight proposed the following jury instruction on damages:

[Y]ou should consider the following past economic damages elements:

1. The reasonable value of necessary medical care, treatment and services received to the present time.

2. The reasonable value of earnings *or earning capacity* lost to the present time.

3. The reasonable value of necessary substitute domestic services and nonmedical expenses that have been required to the present time.

In addition you should consider the following future economic damages elements:

1. The reasonable value of earnings *and/or earning capacity, employment and/or employment opportunities* with reasonable probability to be lost in the future.

2. The reasonable value of necessary substitute domestic services and non-medical expenses that will with reasonable probability be incurred in the future.

CP at 459 (emphasis added).

¶48 Wal-Mart submitted a different jury instruction on damages:

> You should consider the following past economic damage elements:
>
> 1. The reasonable value of necessary health care, treatment, and services received to the present time;
>
> 2. The reasonable value of earnings lost to the present time.
>
> In addition you should consider the following future economic damages:
>
> 1. The reasonable value of necessary medical care, treatment, and services with reasonable probability to be required in the future;
>
> 2. The reasonable value of earnings with reasonable probability to be lost in the future.

CP at 349. Wal-Mart explained, "We . . . took out earning capacity in the past. I think the definition of earning capacity—isn't that carried forward, so should it just be the reasonable value of earnings lost at the present time?" 10 VRP at 1566.

¶49 Hickok-Knight responded:

> Your Honor, I'm making a record; and all I'm saying, earning capacity, it's permanent diminution of the ability to earn money. We have evidence of a permanent injury established by Dr. Loeser, Dr. Vu; and we also have testimony that my client could not do the work of a dental assistant based on [Hickok-Knight's vocational expert witness's] analysis of [Hickok-Knight's] ability to work and the experience she had. Therefore, there is an impaired earning capacity claim that you said—I appreciate the fact that you've said that I can argue [during closing arguments about] lost earning [capacity], but I don't see how—what the problem is or how anyone is being prejudiced by adding earning capacity to that part of the instruction; and . . . if I'm allowed to argue it, why don't we just put it in there?

10 VRP at 1610-11. Agreeing with Wal-Mart, the trial court gave its proposed instruction.

## 2. Susceptibility and aggravation

¶50 Hickok-Knight also requested jury instructions on susceptibility and "lighting up." CP at 454. Although Wal-Mart submitted an aggravation instruction, it argued,

> [W]e don't think either one should come in. There is no testimony, whatsoever, that this was a dormant condition. We had a condition. We're talking about, now, the pain disorder based on psychological factors; and there is no testimony, whatsoever, that she didn't have them. She demonstrated this from the time she was ten years old up to the months before the accident.

10 VRP at 1586. Hickok-Knight argued that the trial court should give the jury both the susceptibility and the aggravation instructions.

¶51 Disagreeing with Hickok-Knight, the trial court ruled:

> I'm not going to give either one of these because, quite frankly, I don't think there has been any testimony from any witness that there was a preexisting condition that was lit up or made active. I think, based on the case law, you need a lot more than the speculation that's being offered to me by both sides.

10 VRP at 1587-88. The trial court further clarified that it refused to give the "susceptibility" jury instruction because "[t]here is no testimony on that" either. 10 VRP at 1588.

## E. Verdict and Cost Bill

¶52 After more than three weeks of trial, the jury unanimously awarded Hickok-Knight $6,433.35 in damages ($5,433.35 in past economic damages and $1,000.00 for past and future noneconomic damages). Because Hickok-Knight had declined Wal-Mart's $30,000.00 offer of judgment, which was greater than the jury's verdict, Wal-Mart considered itself the prevailing party and submitted a cost bill for $5,526.17 under RCW 4.84.010.

¶53 At the hearing to determine costs, the trial court considered CR 68's language: "If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree *must* pay the *costs incurred after the making of the offer*." (Emphasis added.) RCW 4.84.010(5)'s apparently conflicting language provides to the "prevailing party"

[r]easonable expenses, exclusive of attorneys' fees, incurred in obtaining reports and records, which are admitted into evidence at trial or in mandatory arbitration in superior or district court, including but not limited to medical records, tax records, personnel records, insurance reports, employment and wage records, police reports, school records, bank records, and legal files.

Wal-Mart argued that it did not incur the costs of obtaining medical records and conducting depositions until trial. Hickok-Knight contended that the trial court should not award Wal-Mart those costs because Wal-Mart had incurred them before trial and before Hickok-Knight rejected the offer of judgment. Agreeing with Wal-Mart, the trial court awarded it $5,526.17 in costs, primarily comprising costs from deposing witnesses in 2008 and the first half of 2009. After subtracting these costs awarded to Wal-Mart, the total net judgment in favor of Hickok-Knight was $907.18.

## F. Motion for New Trial

¶54 Hickok-Knight moved for a new trial, arguing that the trial court had erred by ordering the "touching of the feet by the jury" and by "the allowance of evidence concerning the medical or social history." 10 VRP at 1621-22. In support, she submitted a declaration from the presiding juror stating, in part, the following:

3. During the course of the trial, the jury was asked or ordered by the court to touch the feet of [Hickok-Knight], and during that process it was obvious that [Hickok-Knight] became upset and appeared to be expressing pain and discomfort to the touch of the jurors.

4. That procedure definitely had an impact on the jurors, and many of them at the time formed the impression that [Hickok-Knight] was overreacting or somehow faking her response. Those jurors felt that such a light touch on her foot could not cause that type of discomfort. This procedure affected the plaintiff's credibility with the jury.

5. During the course of the trial, [Hickok-Knight's] medical history from the time she was a small child until shortly before the accident was covered and the information provided in that medical history led a number of the jurors to believe that [Hickok-Knight] may have been overreacting by seeking emergency room treatment for a variety of problems, though it did not appear that any of those specific problems were bothering her at the time of the accident of June 24, 2006.

6. This medical history and the related testimony also adversely affected [Hickok-Knight's] credibility with the jury.

CP at 536-37.

¶55 Describing the presiding juror's declaration as "vague" and noting that the jury verdict was unanimous, the trial court denied Hickok-Knight's motion. 10 VRP at 1632-33. The trial court further noted:

[Y]ou're not the first tort case that's gone to trial in the last six months that's come back in here and asked . . . for new trials because they didn't like the verdict; and there's ample evidence regarding [Hickok-Knight's] credibility, other than the isolated incident of the foot touching. I mean, there was the surveillance video Wal-Mart got that was done the same morning where she's filling her car with gas, moving around the car fairly readily; and a few hours later, she's hobbling in with a cane to see the medical doctor for the defendant. . . . [S]o I'm going to deny the motion for a new trial.

10 VRP at 1633-34.

¶56 Hickok-Knight appeals the jury's damages award, the trial court's award of costs to Wal-Mart, and the trial court's denial of her motion for a new trial.

## ANALYSIS

### I. Foot-Touching

¶57 Hickok-Knight first argues that the trial court's ordering the jury to touch her feet was reversible error because it was "a glaring comment on the evidence" and amounted to a prejudicial "demonstration or experiment." Br. of Appellant at 36. We disagree that the foot-touching order was a comment on the evidence; but, even assuming, without deciding, that it was an erroneous demonstration, the error was harmless.

### A. No Comment on the Evidence

¶58 Hickok-Knight asserts that the trial court's foot-touching order "conveyed to the jury the court's lack of confidence in the integrity of [Hickok-Knight]'s testimony" about the temperature of her foot and "was a glaring comment on the evidence." Br. of Appellant at 36. Contrary to RAP 10.3(a)(6), Hickok-Knight fails to cite any authority supporting her argument that such a ruling, as opposed to an actual remark about evidence,[11] constitutes commentary on the evidence.[12] Furthermore, as Wal-Mart correctly

---

[11] "To constitute a comment on the evidence, it must appear that the court's attitude toward the merits of the cause are *reasonably inferable* from the nature or manner of the questions asked and the things said." *State v. Cerny*, 78 Wn.2d 845, 855, 480 P.2d 199 (1971) (emphasis added) (citing *State v. Brown*, 31 Wn.2d 475, 197 P.2d 590, 202 P.2d 461 (1948)), *overruled on other grounds by Cerny v. Washington*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972). Trial courts have wide discretion to manage their courtrooms and to conduct trials fairly, expeditiously, and impartially. *State v. Johnson*, 77 Wn.2d 423, 426, 462 P.2d 933 (1969). We review such courtroom management decisions, including any alleged commenting on evidence, for abuse of discretion. *Peluso v. Barton Auto Dealerships, Inc.*, 138 Wn. App. 65, 69, 155 P.3d 978 (2007). Hickok-Knight shows no such abuse of trial discretion here.

[12] Instead, Hickok-Knight relies on *State v. Lampshire*, 74 Wn.2d 888, 447 P.2d 727 (1969), contending that "the personal opinion of a trial judge may be conveyed . . . by implication." Br. of Appellant at 35. But *Lampshire* involved a verbal remark, rather than evidentiary ruling, when the trial court responded to the State's objection to testimony by stating, " 'Counsel's objection is well taken.

notes, our Supreme Court rejected this reasoning in *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970).[13] Thus, Hickok-Knight's argument fails.

## B. Harmless Error

¶59 Hickok-Knight next argues that the foot-touching order was erroneous demonstrative evidence. Assuming, without deciding, that this order was error, we hold that any error was harmless.

■■ ¶60 We review a trial court's admission of demonstrative evidence for an abuse of discretion. *Jenkins v. Snohomish County Pub. Util. Dist. No. 1*, 105 Wn.2d 99, 107, 713 P.2d 79 (1986). Admission of demonstrative evidence may be harmless " 'if the evidence is of minor significance in reference to the evidence as a whole.' " *State v. Hunter*, 152 Wn. App. 30, 42, 216 P.3d 421 (2009) (quoting *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001)), *review denied*, 168 Wn.2d 1008 (2010). Such is the case here.

¶61 Hickok-Knight testified that the temperature of her left foot varied; her left foot could have been any tempera-

We have been from bowel obstruction to sister Betsy, and I don't see the materiality, counsel.' " *Lampshire*, 74 Wn.2d at 891. Our Supreme Court held that although "the remark of the trial judge was made inadvertently in ruling" on the objection, it "implicitly conveyed to the jury his personal opinion concerning the worth of defendant's testimony." *Lampshire*, 74 Wn.2d at 892. Here, however, Hickok-Knight challenges the trial court's *ruling* as a comment on the evidence. Nor does she show that the trial court's opinion on the merits of the cause was "reasonably inferable" from its ruling, even if arguably it could be characterized as a remark. *See Cerny*, 78 Wn.2d at 855-56. Thus, *Lampshire* does not apply.

[13] In *Jacobsen*, the defense counsel objected to certain testimony and the trial court excused the jury. *Jacobsen*, 78 Wn.2d at 494. The trial court also ordered the jury to take with them 11 photographs depicting the scene of an automobile accident, which the State had introduced as evidence. *Jacobsen*, 78 Wn.2d at 494. The *Jacobsen* defendant argued that trial court's order "caused the jury to believe that the court intended these photographs to be considered above all other physical and narrative evidence." *Jacobsen*, 78 Wn.2d at 494. Our Supreme Court disagreed, holding that the order "did not convey to the jury, either directly or by implication, any suggestion as to the court's opinion or feelings as to the credibility, sufficiency or weight of the photographic evidence." *Jacobsen*, 78 Wn.2d at 495. We follow *Jacobsen* here.

ture at that time—the same temperature as her right foot, for example, or perhaps Hickok-Knight's foot went cold minutes after the jury finished touching it. She had already testified that her left foot was changing temperature as she was on the witness stand, prompting one juror to ask whether he could touch it. Any error in allowing the jurors to touch Hickok-Knight's feet was harmless because it was of "minor significance in reference to the evidence as a whole." *Hunter*, 152 Wn. App. at 42 (internal quotation marks omitted).

¶62 Wal-Mart's liability was not before the jury because a pretrial ruling had established that Wal-Mart was liable as a matter of law. The only issues remaining for the jury to decide were causation and damages. The jury found in favor of Hickok-Knight on the causation issue; thus, she bears the burden of showing that, within a " 'reasonable probability,' " the amount of damages that the jury awarded would have been " 'materially affected' " had the foot touching not occurred. *Brundridge v. Fluor Fed. Serv., Inc.*, 164 Wn.2d 432, 446, 191 P.3d 879 (2008) (quoting *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993)); *Saldivar v. Momah*, 145 Wn. App. 365, 401, 186 P.3d 1117 (2008). This is a difficult burden for Hickok-Knight to satisfy.

¶63 "Determination of the amount of damages is within the province of the jury, and courts are reluctant to interfere with a jury's damage award when fairly made." *Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997). If damages are proportionate to and within the range of evidence, " 'they will not be found to have been motivated by passion or prejudice.' " *Hoskins v. Reich*, 142 Wn. App. 557, 572, 174 P.3d 1250 (quoting *Wooldridge v. Woolett*, 96 Wn.2d 659, 668, 638 P.2d 566 (1981)), *review denied*, 164 Wn.2d 1014 (2008). When we view the record as a whole, the record supports the jury's damages award.

¶64 After the jury touched Hickok-Knight's foot, the trial continued for another nearly three weeks, during which the

jury (1) watched 2008 and 2009 surveillance tapes showing Hickok-Knight walking, using a shovel in her yard, and loading bags of groceries into her car, all without obvious physical impairment; and (2) heard both Hickok-Knight's and Wal-Mart's expert witnesses (Drs. Loeser and Wray, respectively) testify that CRPS was as "murky" of a condition as headaches, and was "fairly controversial and unclear in any case." 4 VRP at 550; 5 VRP at 708. These experts' testimonies further rendered the foot-touching order harmless because a reasonable jury could have inferred that (1) Hickok-Knight did not suffer from CRPS; (2) Hickok-Knight was manifesting her "emotional pain or emotional distress" as physical pain; and (3) this "somatization process," and not CRPS or the 2006 foot injury, was behind Hickok-Knight's complaints of pain. 6 VRP at 889-90.

¶65 We further note that the jury's damages award of $6,433.35 was reasonable in light of Hickok-Knight's employment history. For example, a reasonable jury could have concluded that she was unable to maintain a job as a dental assistant for reasons other than her 2006 foot injury, namely, her lack of competency for this type of work. Thus, we decline to hold that, within a "reasonable probability," the amount of damages that the jury awarded "would have been materially affected" had the foot touching not occurred. *Brundridge*, 164 Wn.2d at 446 (internal quotation marks omitted); *Saldivar*, 145 Wn. App. at 401.

¶66 Moreover, independent of the foot touching incident, the jury had ample evidence on which to base its damages award in an amount far below that which Hickok-Knight sought but did not prove. This evidence included: (1) the surveillance video showing an absence of any visible impairment of or injury to her left foot; (2) testimony from Dr. Vu, Hickok-Knight's own doctor and witness, that Hickok-Knight did not experience pain symptoms when her ankle was touched while she was distracted; (3) testimony about Hickok-Knight's employment history of inadequate performance and terminations; and (4) expert witness testimony

about the controversial nature of the CRPS diagnosis. Because Hickok-Knight has not shown prejudice resulting from the foot-touching incident, we hold that any error was harmless.[14]

## II. EVIDENTIARY RULINGS

¶67 Hickok-Knight next argues that the trial court erred by admitting testimony about Hickok-Knight's medical and social histories and by allowing Dr. Hamm to testify.[15] Hickok-Knight's contentions fail.

## A. Standard of Review

¶68 We review a trial court's evidentiary rulings for abuse of discretion. *Minehart v. Morning Star Boys Ranch, Inc.*, 156 Wn. App. 457, 463, 232 P.3d 591, *review denied*, 169 Wn.2d 1029 (2010). A trial court abuses its discretion if the trial court based its decision on untenable grounds or reasons or the decision was manifestly unreasonable. *Yousoufian v. Office of Ron Sims, King County Exec.*, 168 Wn.2d 444, 458, 229 P.3d 735 (2010). A decision is manifestly unreasonable if the trial court, " 'despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take.' " *Yousoufian*, 168 Wn.2d at 459 (internal quotation marks omitted) (quoting *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006)). We leave credibility determinations to the trier of fact; such determinations are not subject to appellate review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). We review questions of law de novo. *State v. Womac*, 160 Wn.2d 643, 649, 160 P.3d 40 (2007).

---

[14] We do not consider the presiding juror's affidavit that Hickok-Knight submitted in support of her motion for a new trial because "juror deliberations must remain secret." *State v. Elmore*, 155 Wn.2d 758, 770-71, 123 P.3d 72 (2005).

[15] The record does not support Wal-Mart's assertion that Hickok-Knight failed to preserve these evidentiary issues for appeal. On the contrary, Hickok-Knight repeatedly objected to testimony about her medical and social histories, as well as to Dr. Hamm's testimony.

## B. Medical and Social Histories

¶69 Hickok-Knight argues that the trial court erred by allowing Drs. Loeser, Hamm, and Silver to testify about her medical and social histories, which she contends were inadmissible. Wal-Mart counters that "[a] party is entitled to cross-examine experts regarding the facts and data underlying their opinions, regardless of whether those underlying facts and data are themselves admissible in evidence." Br. of Resp't at 34. Wal-Mart is correct.

¶70 ER 703, which governs this evidentiary issue, provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*

(Emphasis added.) ER 703 "is not designed to allow a witness to 'summarize and reiterate all manner of inadmissible evidence.'" *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 275, 215 P.3d 990 (2009) (internal quotation marks omitted) (quoting *State v. Martinez*, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995), *abograted on other grounds by State v. Kinneman*, 155 Wn.2d 272, 288, 119 P.3d 350 (2005)). "But the trial court may allow the admission of hearsay evidence and otherwise inadmissible facts for the limited purpose of showing the basis of the expert's opinion."[16] *Deep Water Brewing*, 152 Wn. App. at 275 (citing *State v. Wineberg*, 74 Wn.2d 372, 384, 444 P.2d 787 (1968)).

---

[16] As our Supreme Court has explained:

"[I]f an expert states the ground upon which his opinion is based, his explanation is not proof of the facts which he says he took into consideration[.] His explanation merely discloses the basis of his opinion in substantially the same manner as if he had answered a hypothetical question. It is an illustration of the kind of evidence which can serve multiple purposes and is admitted for a single, limited purpose only."

¶71 Division One's opinion in *DeHaven v. Gant* is instructive. DeHaven complained of pain following surgery, subsequently underwent a personality test at a pain clinic, and eventually sued the doctors and the hospital. *DeHaven v. Gant*, 42 Wn. App. 666, 667-68, 713 P.2d 149, *review denied*, 105 Wn.2d 1015 (1986). During trial, the defendants' expert witness testified about the results of DeHaven's personality test, which she contended was hearsay and prejudicial. *DeHaven*, 42 Wn. App. at 668, 672-73. On appeal, DeHaven argued that the trial court had erred in allowing the defendants' expert to opine about her medical condition, which the expert had based, in part, on her personality test. *DeHaven*, 42 Wn. App. at 672. Disagreeing, Division One of our court held that ER 703 permitted the expert "to testify based upon the test results"—regardless of the admissibility of the underlying test itself—because the expert "testified that the exhibits he reviewed for purposes of his testimony were those reasonably relied upon by physicians in the diagnosis and treatment of patients." *DeHaven*, 42 Wn. App. at 672.

¶72 Similarly here, Hickok-Knight's medical and social histories were the type of evidence "reasonably relied upon by experts in the particular field[s]" of Dr. Loeser (neurological surgery and anesthesiology), Dr. Hamm (psychiatry), and Dr. Silver (psychology). ER 703. Dr. Loeser testified that his treating a patient involves obtaining the patient's medical history; and he agreed that it was "valuable" to look at Hickok-Knight's medical history. 4 VRP at 595-96. Dr. Hamm testified that psychiatrists rely on medical records, not only to "see what medical problems people have had," but also "how they adapt to [them], how they respond to [them], how they use the medical care system, what kind of complaints or difficulties they've had, . . . that's important to me as a psychiatrist in understanding

*Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 400, 722 P.2d 787 (1986) (first alteration in original) (citation omitted) (quoting *State v. Wineberg*, 74 Wn.2d 372, 382, 444 P.2d 787 (1968)).

an individual." 5 VRP at 867. Similarly, Dr. Silver testified that Hickok-Knight's social history was "significant" because "the extent of someone's stress and their coping skills affects how vulnerable they are to pain and affects their ability to adjust and cope with pain." 7 VRP at 1168. Dr. Silver agreed that it was "very important" to learn about Hickok-Knight's "psychological, traumatic life experiences that have impacted" her. 7 VRP at 1119.

¶73 We hold that the trial court did not err in permitting Dr. Loeser, Dr. Hamm, and Dr. Silver to testify about Hickok-Knight's medical and social histories, which were "of a type reasonably relied upon by experts in the particular field[s] in forming opinions or inferences upon the subject" at issue. ER 703.

## C. Dr. Hamm's Testimony

¶74 Hickok-Knight next argues that the trial court erred by allowing Dr. Hamm's testimony about her CRPS treatment because (1) he based it "solely" on Hickok-Knight's past medical and social histories, which was "highly prejudicial"; (2) Dr. Hamm "has no special knowledge of CRPS and d[id] not even purport to address CRPS in his report" and, therefore, was not qualified to testify that "the treatment [Hickok-Knight] received for CRPS was not appropriate"; and (3) "Dr. Hamm's diagnosis of [Hickok-Knight's] 'psychological borne problem' " was contrary to "evidence that there were physical and organic findings of CRPS reported by her treating physician Dr. Vu." Br. of Appellant at 41-42. This argument also fails.

¶75 First, as we have already explained, under ER 703, Dr. Hamm could testify about Hickok-Knight's medical and social histories in connection with rendering his expert opinion about the appropriateness of Hickok-Knight's treatment, regardless of whether these underlying histories were themselves admissible. Second, Dr. Hamm is a board-certified medical doctor with additional training in psychia-

try who has treated, diagnosed, and evaluated patients, including those with CRPS, for several decades.[17] And ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Such was the case here.

¶76 Third, Hickok-Knight does not explain how the trial court's permitting Dr. Hamm (Wal-Mart's witness) to testify that Hickok-Knight had a "psychological borne problem" was erroneous simply because it contradicted Dr. Vu's (Hickok-Knight's witness) testimony that Hickok-Knight suffered from CRPS. 6 VRP at 931. "[E]vidence is tested by the adversarial process within the crucible of cross-examination, and adverse parties are permitted to present other challenging evidence." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 607, 260 P.3d 857 (2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). Accordingly, we hold that the trial court did not abuse its discretion in permitting Dr. Hamm to testify.

## III. No Trial Court Bias

¶77 Next, Hickok-Knight contends that the trial court "expressed bias" toward her lawsuit and violated the appearance of fairness doctrine. Br. of Appellant at 43. Wal-Mart responds that Hickok-Knight did not preserve this issue for appeal because she failed to argue bias or to move for recusal below. Even assuming, without deciding, that Hickok-Knight may raise this issue for the first time on appeal, her argument fails.

---

[17] In contrast, Hickok-Knight provides no authority or proof that Dr. Hamm lacked the requisite "knowledge, skill, experience, training, or education" to opine on the appropriateness of Hickok-Knight's treatment for CRPS. ER 702.

318

¶78 We presume that a trial court "perform[ed] its functions regularly and properly without bias or prejudice"; the party claiming bias or prejudice "must support the claim with evidence of the trial court's actual or potential bias." *Bus. Servs. of Am. II, Inc. v. WaferTech LLC*, 159 Wn. App. 591, 600, 245 P.3d 257 (2011), *aff'd*, 174 Wn.2d 304, 274 P.3d 1025 (2012). "The test to determine whether a judge's impartiality might reasonably be questioned is an objective one that 'assumes that a reasonable person knows and understands all the relevant facts.'" *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 340, 54 P.3d 665 (2002) (internal quotation marks omitted) (quoting *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995)). Hickok-Knight fails to provide any evidence of bias here.

¶79 Hickok-Knight asserts that the trial court violated the appearance of fairness doctrine by (1) describing CRPS as a "murky" diagnosis and stating that "there were no organic or objective findings to justify [Hickok-Knight's] complaints of pain"; (2) allowing Wal-Mart "to continually bring up [Hickok-Knight's] prior injuries and medical conditions throughout the trial"; (3) "clearly indicat[ing] to the jury it [the trial court] did not believe [Hickok-Knight's] complaints of pain were valid" when it allowed the jury to touch her foot; and (4) commenting that " 'we haven't even established whether or not [Hickok-Knight] suffers from the touch' " in sustaining Wal-Mart's objection to Hickok-Knight's counsel's statement during Dr. Vu's direct examination. Br. of Appellant at 43-45. None of these circumstances show trial court bias.

## A. "Murky" CRPS

¶80 The trial court did not label CRPS "murky"; rather, in discussing the jury instructions outside the jury's presence, the trial court stated:

Well, I know from prior cases where—that medical testimony is speculation or conjecture, then a directed verdict should be

given for the defendants. This is a case where even some of the *plaintiff's medical doctors have testified that it is a murky and uncertain area* when you're suffering from the [CRPS] where there are no organic or objective findings, so I think it is an appropriate one regarding the medical testimony because I think even [Hickok-Knight's] witnesses testified that it is not a definitive area of treatment at this point and that—*Dr. Vu, himself, used the word "murky"*;[18] so, I mean, that could be, [m]ay have, could have, or possibly did; and I think that there is, you know, evidence here where a jury could find that it's simply speculation whether or not this kind of CRPS even exists.

10 VRP at 1561 (emphasis added). The trial court did use the term "murky" in a later context, nearly two months after the jury delivered its verdict. During oral argument on Hickok-Knight's motion for a new trial, the trial court stated:

Now, you're not the first tort case that's gone to trial in the last six months that's come back in here and asked . . . for new trials because they didn't like the verdict; and there's ample evidence regarding your client's credibility, other than the isolated incident of the foot touching. I mean . . . *even one of her own doctors*, the one that did the nerve conduction, *basically said that this was a very murky diagnosis.*

---

[18] The record does not reflect that Dr. Vu used the term "murky." On cross-examination, however, Wal-Mart asked Dr. Vu, "There's been no published paper. There's been no scientific documentation, this is what causes [CRPS]. There's some theories. There's some ideas. Medical science really doesn't know the cause?" Dr. Vu responded, "Yeah." 4 VRP at 686-87. Dr. Vu also called CRPS a "tough diagnosis." 4 VRP at 677.

Dr. Loeser, Hickok-Knight's witness, testified that "[h]eadaches are every bit as murky as CRPS," 4 VRP at 550, and further explained:

[CRPS] is not a psychiatric or psychological condition. It is a medical condition whose mechanism of ideology we don't understand completely, but we don't understand headache either; and it's a "there" medical condition. There are lots of things physicians aren't smart enough to understand, but that's not a reason for labeling something psychiatric.

4 VRP at 560-61. And when Wal-Mart asked Dr. Wray, Wal-Mart's expert neurologist witness, whether she believed that CRPS is a "murky and controversial condition," Dr. Wray replied, "Yes." 5 VRP at 779. These comments were not, however, from the trial court. Furthermore, Hickok-Knight did not object to them below.

10 VRP at 1633-34 (emphasis added). Again, not only was the jury not present either, but also this colloquy occurred two months *after* the jury rendered its verdict.

¶81 In both instances when the trial court used the word "murky," it was simply echoing the testimonies of various expert witnesses, including Dr. Loeser and Dr. Vu (both Hickok-Knight's witnesses); this echoing did not reflect "actual or potential bias." *Bus. Servs. of Am. II*, 159 Wn. App. at 600. Moreover, Hickok-Knight fails to persuade us that the trial court could have violated the appearance of fairness doctrine simply by describing witness testimony outside the jury's presence.

### B. Foot Touching; Hickok-Knight's Medical and Social Histories

¶82 Hickok-Knight also contends that the trial court expressed bias by ordering the jury to touch Hickok-Knight's left foot and by permitting various expert witnesses to testify about Hickok-Knight's medical and social histories. As we have already held earlier in this opinion, these trial court rulings were either not error at all or harmless error.

¶83 Hickok-Knight also asserts that the trial court expressed bias when it stated, out of the jury's presence, " '[W]e haven't even established whether or not [Hickok-Knight] suffers from the touch' " of her foot by the jurors. Br. of Appellant at 44-45. Again, Hickok-Knight fails to persuade us that the trial court's "impartiality may be reasonably questioned." *Behr Process Corp.*, 113 Wn. App. at 340.

### IV. JURY INSTRUCTIONS

¶84 Next, Hickok-Knight argues that the trial court erred by removing language about earning capacity from the damages instruction and by refusing to give at least one of the requested susceptibility, lighting up, and aggravation instructions. As she properly notes, " 'Impairment of earn-

ing capacity is different from loss of wages. It is the permanent diminution of the ability to earn money.' " Reply Br. of Appellant at 21 (quoting 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 30.08.01, at 308 (2011)).[19] Thus, because earning capacity is different from lost wages, the trial court should have instructed the jury as to both. Nevertheless, her argument fails because, even if the jury instructions were erroneous, Hickok-Knight has failed to establish that these errors caused her any prejudice.

## A. Standard of Review

¶85 If the challenge on appeal goes to the language of a jury instruction, as opposed to the exclusion of an entire instruction, we review the instruction de novo, evaluating the jury instruction " 'in the context of the instructions as a whole.' " *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 521, 158 P.3d 1193 (2007) (quoting *State v. Benn*, 120 Wn.2d 631, 644-45, 845 P.2d 289 (1993)). When a trial court refuses to give a jury instruction because of a factual dispute, we review the refusal for an abuse of discretion. *State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). "Jury instructions are sufficient when they allow counsel to argue their theories of the case, do not mislead the jury, and when taken as a whole, properly inform the jury of the law to be applied." *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 453, 105 P.3d 378 (2005). "Jury instructions are sufficient if they are readily understood and are not misleading to the ordinary mind." *State v. Sublett*, 156 Wn. App. 160, 183, 231 P.3d 231 (citing *State v. Dana*, 73 Wn.2d 533, 537, 439 P.2d 403 (1968)), *review granted*, 170 Wn.2d 1016 (2010). "Even if an instruction may be misleading, it will not be reversed unless prejudice is shown by the complaining party." *State v. Aguirre*, 168

---

[19] (Citing *Kelley v. Great N. Ry.*, 59 Wn.2d 894, 371 P.2d 528 (1962); *Murray v. Mossman*, 52 Wn.2d 885, 329 P.2d 1089 (1958).)

Wn.2d 350, 364, 229 P.3d 669 (2010) (citing *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002)).

¶86 Here, we review the language of the trial court's damages instruction under the de novo standard to determine whether it permitted Hickok-Knight to argue her theory of the case. We also review the trial court's refusal to give the susceptibility and aggravation instructions for an abuse of discretion: A trial court abuses its discretion in refusing to give an instruction where it adopted a view that "no reasonable person would have taken." *Kim v. Moffett*, 156 Wn. App. 689, 697, 234 P.3d 279 (2010); *Walker*, 136 Wn.2d at 771-72. In neither instance do we find reversible error.

## B. Earning Capacity

¶87 Hickok-Knight argues that the damages jury instruction 11 did not permit her to argue her "theory of recovery on the basis of impaired earning capacity." Br. of Appellant at 47. More specifically, she contends that the trial court's damages instruction prevented her from seeking "future damages based on her inability to work as a dental assistant versus an office assistant." Reply Br. of Appellant at 21. We disagree. It was the evidence, not the instructions, that led to the jury's low damages verdict. From Hickok-Knight's employment records from her dental assistant position a reasonable jury could infer that (1) Hickok-Knight's inability to work as a dental assistant flowed from things other than her foot injury in 2006, such as her personality or incompetencies; and (2) her 2006 foot injury at Wal-Mart, therefore, did not limit her lifetime earning capacity. We hold that Hickok-Knight has not shown that the language of the damages instruction prevented her from arguing and persuading the jury about her theory of the case or otherwise prejudiced her. *See Torno v. Hayek*, 133 Wn. App. 244, 253, 135 P.3d 536 (2006).

## C. Susceptibility and Aggravation Instructions

¶88 Out of a nearly three-week trial, only brief parts of Drs. Silver's and Hamm's entire testimonies arguably supported susceptibility and aggravation instructions. The trial court refused to give Hickok-Knight's proposed susceptibility and lighting up instructions, numbers 6 and 8, concerning a "bodily or mental condition that was not causing pain or disability" existing before her 2006 foot injury, which (1) made her "more susceptible to injury than a person in normal health" (susceptibility), or (2) "was lighted up or made active" (lighted up) by her foot injury.[20] CP at 452, 454. The trial court refused these instructions because it believed that there was no testimony to support giving them.

¶89 Contrary to the trial court's belief, Dr. Silver testified that Hickok-Knight had "a history of having a psychological traumatic event as a teenager" and that people who have suffered from traumatic events "are more vulnerable" and "don't cope as well with injuries and pain." 7 VRP at 1119-20. The questions before us, however, are whether the supporting facts "[rose] above speculation and conjecture," *Bd. of Regents of Univ. of Wash. v. Frederick & Nelson*, 90 Wn.2d 82, 86, 579 P.2d 346 (1978), and whether this evidence was substantial enough to require

---

[20] Hickok-Knight's proposed susceptibility instruction read in full:

If you find that:
(1) before this occurrence the plaintiff had a bodily or mental condition that was not causing pain or disability; and
(2) the condition made the plaintiff more susceptible to injury than a person in normal health,
then you should consider all the injuries and damages that were proximately caused by the occurrence, even though those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition.
There may be no recovery, however, for any injuries or disabilities that would have resulted from natural progression of the pre-existing condition even without this occurrence.
CP at 454.

the trial court to give the requested instruction. *Stiley v. Block*, 130 Wn.2d 486, 925 P.2d 194 (1996). In light of this scant evidence, we cannot say that the trial court abused its discretion in refusing to give the susceptibility instruction.

¶90 Wal-Mart's proposed aggravation instruction concerned a "pre-existing bodily or mental condition that was causing pain or disability," which pain or disability Hickok-Knight's 2006 foot injury "aggravated."[21] CP at 463. The trial court similarly refused this instruction because the evidence did not support giving it. Although Dr. Hamm testified that he had diagnosed Hickok-Knight with "somatoform pain disorder," also known as "pain disorder with psychological factors," the trial court was correct that the testimony did not show that this pain disorder was aggravated by her foot injury. 6 VRP at 886. Accordingly, we hold that the trial court did not abuse its discretion in refusing to give this aggravation instruction.

## V. MOTION FOR NEW TRIAL

¶91 Hickok-Knight also argues that, based on the trial court's ordering the jury to touch her foot and admitting testimony about her medical and social histories, the trial court erroneously denied her CR 59(a) motion for a new trial. This argument also fails.

¶92 We review for abuse of discretion a trial court's denial of CR 59(a) motion for a new trial. *Collins v. Clark*

---

[21] Wal-Mart's "proposed" aggravation instruction read in full:

If you find that:
(1) before this occurrence the Plaintiff had a pre-existing bodily or mental condition that was causing pain or disability, and
(2) because of this occurrence the condition or the pain or the disability was aggravated,
then you should consider the degree to which the condition or the pain or disability was aggravated by this occurrence.

However, you should not consider any condition or disability that may have existed prior to this occurrence, or from which the plaintiff may now be suffering, that was not caused or contributed to by this occurrence.

CP at 463.

*County Fire Dist. No. 5*, 155 Wn. App. 48, 81, 231 P.3d 1211 (2010). "The test for determining such an abuse of discretion is whether 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent [the] litigant from having a fair trial.'" *Collins*, 155 Wn. App. at 81 (alteration in original) (internal quotation marks omitted) (quoting *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000)). As we have already held, the foot touching order was harmless, if error, and admission of testimony about Hickok-Knight's medical and social histories was not error at all. Hickok-Knight having failed to show the lack of a fair trial or prejudicial error in the trial court's denial of her motion for a new trial, we affirm.

VI. Costs and Attorney Fees

A. Costs Award to Wal-Mart Below

¶93 Lastly, Hickok-Knight argues that the trial court erred by awarding Wal-Mart costs incurred before it made an offer of judgment. To the extent that the trial court's costs award to Wal-Mart included such preoffer costs, we agree.

¶94 The standard of review for an award of costs involves a two-step process. First, we review de novo whether a statute, contract, or equitable theory authorizes the award. Second, if such authority exists, we review for abuse of discretion the amount of the award. *Estep v. Hamilton*, 148 Wn. App. 246, 259, 201 P.3d 331 (2008).

¶95 Under CR 68, an offeree must "pay the costs incurred *after* the making of the offer" if the judgment that the offeree obtains is less than the offer. (Emphasis added.) Wal-Mart asserted, and the trial court apparently agreed, that under RCW 4.84.010(5), a party incurs the costs of obtaining reports and records when the party has the reports and records admitted into evidence at trial; there-

fore, Wal-Mart incurred the costs of obtaining reports and records "after the making of the offer," for CR 68 purposes because, according to its reading of RCW 4.84.010(5), Wal-Mart did not incur those costs until it offered, and the trial court admitted, the reports and records at trial. We disagree.

¶96 RCW 4.84.010(5) provides a prevailing party with "[r]easonable expenses . . . *incurred in obtaining* reports and records, *which are admitted* into evidence at trial." (Emphasis added.) The prevailing party incurs the costs when it "obtain[s]" the reports and records, *not* when the party has them admitted into evidence at trial. The clause "which are admitted into evidence at trial" is a restrictive clause that limits the reports and records for which the prevailing party may be reimbursed; the clause does not define the moment at which the statute deems that the prevailing party actually incurs the costs for those reports and records. More specifically, the clause does not state that such costs are deemed incurred when admitted at trial; rather, it merely limits cost reimbursement to those reports and records ultimately used and actually admitted at trial.

¶97 We hold that the plain language of RCW 4.84.010(5) did not authorize the trial court's award of costs to Wal-Mart for expenses incurred before its offer of judgment to Hickok-Knight, including expenses for depositions and medical records that Wal-Mart obtained before its offer of judgment (though eventually offered into evidence at trial). Rather, Wal-Mart incurred these costs at the time it *obtained* these depositions and records, before its offer, *not* when it had them admitted into evidence at trial. Accordingly, we vacate the trial court's cost award to Wal-Mart and remand to the trial court to recalculate this award consistent with this opinion.

### B. Attorney Fees on Appeal

¶98 Hickok-Knight requests attorney fees on appeal. But, contrary to RAP 10.3(a)(6), she fails to provide

argument and citation to authority in support of this request. Instead, she presents only a " 'bald request for attorney fees' " on appeal, which is insufficient. *Hudson v. Hapner*, 170 Wn.2d 22, 33, 239 P.3d 579 (2010) (quoting *Wilson Court Ltd. P'ship. v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998)). Accordingly, we deny her request for attorney fees on appeal.

¶99 We vacate the trial court's costs award to Wal-Mart and remand with instructions to recalculate costs. We affirm the trial court on all other grounds.

JOHANSON, A.C.J., and ARMSTRONG, J., concur.

Review denied at 176 Wn.2d 1014 (2013).