IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 40431-5-III |
| R.M.A. | ) | (Consolidated with |
| | ) | No. 40432-3-III) |
| J.A.C. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

STAAB, J. —The mother of R.M.A. and J.A.C. (the Mother) appeals the trial court's findings that her children are dependent. She raises several issues on appeal and asks that we reverse the order of dependency. We agree with the Mother that some of the court's findings of dependency rely on unsupported factual findings and inadmissible hearsay evidence. Additionally, we conclude that the court's reliance on hearsay materially affected the outcome of the case and we grant the mother's request to reverse the order of dependency. As such, we decline to address the remaining issues raised by the Mother.

BACKGROUND

R.M.A. was born in 2012 and J.A.C. was born in 2019. The Mother and J.A.C.'s father (the Father) have been in an intimate relationship for eight years. R.M.A. never

met her biological father but she developed a close relationship with J.A.C.'s father, who became a father figure to her.

The Mother was a victim of domestic violence in 2016. She contacted law enforcement after she was physically assaulted by her then-boyfriend D.M. D.M. had assaulted her a couple of times before. The responding officer offered the Mother domestic violence resources, a shelter placement, and ambulance services for medical treatment. She declined. D.M. was charged with second degree assault and a protective order was put in place.

The Mother had also been physically assaulted by her mother (the Grandmother) growing up. The Mother was also assaulted by another former partner, D.B., though there is no information regarding the extent of this assault or when it occurred.

When J.A.C. was born in August 2019, the Department of Children, Youth, and Families (the Department) received an intake containing allegations that the Mother had a positive urinalysis test (UA) both while pregnant and again upon admittance to the hospital. The intake also relayed concerns that there was a lack of bonding between the Mother and J.A.C. The Department conducted an investigation. Blood from J.A.C.'s umbilical cord tested positive for methamphetamine. The Mother disclosed to the investigator that she used methamphetamine once after her grandparent's recent passing and this accounted for both positive UAs. The investigation also revealed that any apparent lack of bonding was likely because the Mother was recovering from a cesarean

2

section and could not easily pick up the baby. Based on the investigation, the

Department determined that there was never a safety threat to J.A.C. and closed the case.

The Mother's friend helped take care of the children when they were young. The

friend and the Mother were once involved in a shoving match that resulted in the Mother

going to the hospital. There is no information regarding the origin of the shoving match,

extent of injuries if any, or when it occurred.

*The 2021 incident*

On September 6, 2021, law enforcement received multiple calls about a fight in

the WinCo Foods parking lot, including calls from the Mother and Grandmother. The

surveillance video showed the Father and the Mother, driving separate vehicles, parked in

front of the grocery store. A woman got out of the Father's car and walked into the store.

The Mother got out of her car and started to follow the other woman inside but then

turned around and came back toward her car. By that time, the Father had gotten out of

his car and the two exchanged words. There was "some light shoving back and forth

between them." Rep. of Proc. (RP) at 194. The Father then shoved the Mother, causing

her to fall to the ground. They both then returned to their vehicles and drove away.

A second surveillance video showed what occurred next. The Father was driving

in the center lane and stopped as he reached an intersection. The Mother also pulled up

to the intersection, slightly in front of the Father's vehicle, in the right turn lane. The

Mother got out of her vehicle, and staying about ten feet from the Father's vehicle,

appeared to be shouting toward him. As the Mother got back into her car, the Father accelerated toward her and hit her vehicle. The children and D.B. were in the Mother's vehicle at the time of the collision.

The investigating officer never spoke with the Mother or Father. After interviewing the Grandmother and D.B., the officer requested multiple charges be filed. A few weeks later, the Father was charged with second degree assault and four counts reckless endangerment.

*The Department's involvement*

In February 2023, about 16 months after the 2021 incident, a domestic violence protection order was entered in that case, restraining the Father from contact with the Mother. The protection order was not served on the Mother, however, and it is not clear if she was aware of the order. The Mother and Father continued to cohabitate after the protective order was issued.

A social worker was assigned to the family in March 2023. She reviewed the case file which noted concerns regarding domestic violence, substance use in the home, and the Mother's mental health. The social worker spoke with the Mother over the phone several times. She did not inform the Mother of the allegations being investigated. However, the Mother expressed to the social worker that any allegations were false and fabricated by the Grandmother.

During one call with the Mother, the social worker explained that she needed to speak with the Father as part of the case. Immediately following that conversation, the Father returned the social worker's call.

The social worker reviewed reports from the Grandmother, spoke with the Mother's sister, and conducted multiple interviews with R.M.A. The social worker spoke with R.M.A.'s schoolteacher and attempted to contact the family's neighbors. She also requested police records, none of which reported domestic violence since the 2021 incident. Any reports of domestic violence after the 2021 incident were made by the Mother's family members.

The social worker received reports from the Grandmother and D.B. that the Mother and Father were cohabitating in violation of the protective order. The Department also received an intake regarding statements R.M.A. made to a school counselor. These intakes were sent to a detective who reviewed the allegations in the reports and conducted an interview with R.M.A. The interview lasted 15-20 minutes. Based on the interview and intakes, the detective took R.M.A. and J.A.C. into protective custody.

After the children were removed, there was a family team decision meeting, during which the Mother was disruptive because of her swearing. The meeting ended because the area administrator determined it was not going to be productive.

*Dependency petition*

On May 26, 2023, the Department filed a petition asserting three grounds for dependency: drug use by the Mother, the children's exposure to domestic violence, and the Mother's mental health issues. Following a shelter care hearing a few days later, the children were placed in out-of-home care with a relative.

A new social worker was assigned in August 2023. The Mother asked the new social worker what services the Department would be recommending. The social worker responded, recommending a substance use assessment, random UAs, and ongoing counseling to address trauma from domestic violence. She subsequently added recommendations for a mental health assessment and a parenting assessment. In October, the court ordered therapeutic visits.

The Mother submitted at least one UA but refused to do others out of spite toward the Grandmother. She met with a mental health counselor twice to complete the mental health assessment. She also attended one appointment with the Department's preferred provider for the therapeutic visits but declined to engage in additional visits. The Mother requested the parenting assessment and was on a wait list for a provider at the time of the dependency hearing.

Each month, the Mother reached out to the social worker asking what services she needed to do or what was being recommended. The social worker responded promptly, often with the same list of services because the recommendation had not changed. The

Mother agreed with some services and disagreed with others; generally, she did not want to engage in services unless they were court ordered. The social worker submitted referrals for the services the Mother wanted and continued to recommend the services she declined.

In October 2023, the children were removed from their relative placement and placed in licensed foster care because of family conflict. Around the same time, the Mother and the Grandmother were in an altercation over a family member's phone. The Grandmother shoved the Mother against a wall, and the Mother contacted law enforcement. No charges were filed.

The Father pleaded guilty to fourth degree assault in October 2023 for the 2021 incident and the no contact order was recalled. The Mother immediately contacted the social worker, requesting that the Father be allowed to visit the children with her in the home. The Mother attended visits regularly throughout the shelter care period.

One week before the fact finding hearing, the Mother completed a domestic violence victim risk assessment, but the results were not yet available at trial.

*Dependency fact finding hearing*

The dependency fact finding hearing was held on March 6 through 8, 2024. Ten witnesses testified.

The Mother testified first. She told the court that the Father never assaulted her. Regarding the 2021 incident, she stated that the Father did not intentionally crash his

7

vehicle into hers. She explained that he later agreed to enter an *Alford*[1] plea admitting

guilt to the assault charge only because the prosecutor said the protective order would be

dropped. Her testimony regarding whether she was aware of the no contact order while

living with the Father was contradictory and inconsistent.

The Department called three other lay witnesses: the officer who responded when

the Mother was assaulted by D.M. in 2016, the officer who investigated the 2021

incident, and the Department's preferred provider for therapeutic visits. Each witness

testified consistently with the facts above.

The remaining six witnesses were qualified as expert witnesses. These expert

witnesses were: the Department's investigator at the time of J.A.C.'s birth, the detective

who initially removed R.M.A. and J.A.C. from the home, the social worker assigned in

March 2023, the social worker assigned in August 2023, the counselor who performed

the mental health assessment, and the children's guardian ad litem (GAL).[2] Over

objection, the trial court allowed most of these witnesses to testify about hearsay

statements on direct examination for the limited purpose of explaining their opinions.

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).
[2] The court considered whether a GAL is an expert for the purposes of allowing hearsay testimony to support her opinion and recommendation. It ruled that "according to case law, [the GAL] is an expert in this family's dynamics and status." RP at 308.

The Department's investigator at the time of J.A.C.'s birth was qualified as an

expert in social work. She testified consistently with the facts above. She did not render

an opinion or recommendation regarding dependency.

The detective who initially removed R.M.A. and J.A.C. from the home was

qualified as an expert in child forensic interviewing. In addition to his testimony

consistent with the above facts, the court allowed the detective to testify to hearsay

statements that formed the basis of his opinion. The court ruled that such testimony was

not admissible as substantive evidence and would not be considered for the truth of the

matter.

The detective testified to hearsay evidence including the contents of the

Department's reports received from the Grandmother, D.B., and R.M.A.'s school. He

also testified to R.M.A.'s statements made during his interview with her. The detective

noted that some of R.M.A.'s statements were consistent with the Department's intakes,

but that R.M.A. did not mention certain other allegations listed in the reports.

Finally, the Detective recounted why he believed that protective custody was

necessary to protect the children:

> based on everything [I] heard in conjunction with the intakes . . . to me, it
> was the concerns about drugs . . . .
>     And then also the concern of what sounded like constant violations
> of a no contact order. And at that time, I didn't feel that I had probable
> cause to make an arrest because the child wasn't able to narrow down really
> a date or a time the last time that they had been around one another or even

a location, but that was a concern and also part of the reason for taking
them into protective custody.

RP at 118-19. The detective did not render an opinion or recommendation regarding

dependency.

The social worker who was assigned in March 2023 testified as an expert in social

work. In addition to her testimony consistent with the above facts, she was also allowed

to testify to hearsay, which the court ruled was limited to the purpose of establishing the

basis of her opinion.

The social worker testified extensively to statements made to her throughout her

initial investigation. She relayed her recollection of conversations with the Mother's

sister and R.M.A.'s schoolteacher. She also detailed the contents of her interviews with

R.M.A. The social worker could not remember if she evaluated whether R.M.A.

understood the difference between truth and a lie, nor did her case notes indicate such an

interaction. The social worker concluded that based on her investigation of the

Department's concerns and her interactions with R.M.A., she felt it was in the children's

best interest that they be found dependent.

The Department also called the social worker who was assigned in August 2023 to

testify as an expert in social work. The social worker expressed concerns regarding

substance use, domestic violence, and insufficient supervision of the children; these

concerns were based on the allegations in the dependency petition.

She also articulated a concern regarding the Mother's mental health based on the mental health assessment the Mother completed, and the social worker's personal interactions with her. The social worker stated that the Mother telephoned her about ten times, and in each instance the Mother would call her names, "cuss her out," and then hang up. Because of these interactions, the social worker restricted their communications to text messages. The social worker testified that she and the Mother began communicating exclusively over text for four-and-a-half months prior to the hearing and that it was "going well." RP at 224. She reported that the swearing and name calling had stopped, and the Mother was sharing her frustration in a non-aggressive manner. The social worker also testified that neither she nor any other social worker ever suspected the Mother of being under the influence during their interactions.

Additionally, the court allowed the social worker to testify to hearsay statements that formed the basis of her opinion. The court ruled that such testimony was not admissible as substantive evidence and would not be considered for the truth of the matter. This testimony included the contents of the dependency petition, Department reports, and statements made by R.M.A. during their conversations.

The Department asked the social worker what services she would recommend to the Mother based on each of her concerns, should the court find the children dependent. She recommended a chemical dependency assessment and random UAs for the substance use concern. She then recommended counseling to address the domestic violence and the

Mother's past trauma, and to learn more about healthy relationships. Finally, she recommended a psychological assessment and ongoing counseling to address the mental health concerns.

The social worker concluded that the Mother was not capable of parenting without the Department's and the court's involvement. She believed the children would be in danger of substantial damage to their psychological or physical development if they relied on their Mother for care. Additionally, the social worker believed the children's psychological development had been affected by the Mother's mental health issues because the children witnessed her anger and aggression exhibited by yelling and swearing.

The mental health counselor who performed the Mother's mental health assessment testified as an expert. The assessment was conducted virtually over two sessions four months apart. The counselor confirmed that during those sessions, the Mother acknowledged domestic violence in her past and denied any current domestic violence. She also denied substance abuse. The counselor testified that she believed the Mother's assertion that she was not using drugs. However, she did not believe the Mother's denial of domestic violence between her and the Father because it contradicted information the counselor received from the Department. Additionally, the counselor found the Mother not credible because of "her full presentation . . . her lack of cooperation with the assessment, [and] her defensiveness." RP at 159-60.

12

The counselor identified six problems that led her to make three diagnoses. The problems included: lack of motivation for treatment, possible cognitive disorder, history of trauma, history of anxiety with panic attacks, lack of a high school diploma, and lack of a driver's license. From these problems, the counselor diagnosed the Mother with post traumatic stress disorder, generalized anxiety disorder, and panic disorder. The counselor further testified that, at the time of the assessment, the Mother was unwilling to address, acknowledge, or treat any of the identified conditions.

The counselor explained that the problems and diagnoses affected the Mother's ability to parent for several reasons. First, the problems affected the Mother's ability to stand up for herself and protect herself, which in turn could affect her ability to protect the children. Second, she testified that "a lack of a high school degree limits your options, in terms of being able to take care of yourself and your children and not be reliant on domestic violence perpetrators, or, you know, makes you more dependent and helpless." RP at 165. The counselor further noted the Mother's failure to graduate high school was evidence of her poor problem-solving skills.

The counselor recommended the Mother comply with Department services, receive domestic violence victim treatment, and attend parenting classes. She also believed the Mother would benefit from trauma counseling and a psychological evaluation to rule out any neurocognitive disorders. The counselor felt the psychological evaluation was necessary because the Mother's "whole irrational defensiveness and lack

13

of cooperation seem[ed] really irrational, given the situation." RP at 160. She also cited her concerns that the Mother did not finish high school, would drive without a license, and was unable to keep a job.

The counselor concluded that the children would not be safe under the Mother's care because she "lacked insight and had poor judgment." RP at 154-55. She further reasoned that "the children are being traumatized if [the Department report] is true . . . I think it's a chaotic lifestyle for the kids." RP at 161. And "I believe she loves her kids, but she's—the steps she's taking are not one[s] of protectiveness." RP at 160.

Finally, the children's GAL testified. She stated she met R.M.A. five times and J.A.C. three times in the months prior to the hearing. The GAL observed multiple visits between the Mother and children, reporting that: "The visits went very well. There's no question that [the Mother] loves her children and her children love her." RP at 270.

The court deemed the GAL an expert and allowed her to testify to hearsay statements that formed the basis of her opinion. The court ruled that such testimony was not admissible as substantive evidence and would not be considered for the truth of the matter. Accordingly, the GAL testified to statements made by R.M.A. Finally, the GAL stated her belief that dependency was in the best interest of the children. She explained that her recommendation was based on "reviewing . . . everything—all of the notes, all of the discovery, meeting with the children." RP at 256.

*The court's oral ruling and written findings and conclusions*

At the close of evidence, the court again discussed with the parties what expert evidence it would consider as substantive. Specifically, the parties agreed that all of R.M.A.'s statements could only be used to lend credibility to the experts' opinions. The court orally ruled that "[w]hat [R.M.A.] has said is out as substantive evidence, but it is in as far as it justifies an expert opinion." RP at 275. Additionally, the court confirmed that the Department was not proffering any statements, reports, or other documents in the Department's files, other than to justify expert opinion.

The court organized the evidence and its written findings and conclusions based on the three grounds advanced by the Department in favor of dependency: mental health, substance use, and domestic violence. Relevant to all three grounds, the court found the expert witnesses were all credible and their opinions were supported by reasonable foundations. Further, the experts were more credible than the Mother, whose testimony was questionable, inconsistent, and contradictory.

The court determined there was insufficient evidence for a finding of dependency as to either the Mother's mental health or on the issue of substance abuse. It found that "[t]he experts' opinions that mother's substance abuse was a basis for removal of the children were based in part on statements not available for substantive evidence." Clerk's Papers (CP) at 511, 1053.

15

However, the court found that the evidence supported a finding of dependency due to domestic violence, stating that "[t]he child would not be safe in her mother's care at this time." CP at 512-13, 1054-55. In addition to findings consistent with the facts above, the court found the following:

> 2.2.15 [The investigating officer] testified observing to two videos while investigating the 2021 assault by [the Father] on [the Mother]. The first was at the Winco parking lot and depicted [the Mother] being the first to become physically aggressive with another woman followed by [the Father] pushing [the Mother] to the ground. The second video was taken outside the Dairy Queen and depicted [the Mother] leaving her vehicle and interacting with [the Father]'s vehicle as the primary aggressor followed by [the Father] intentionally driving his vehicle into [the Mother]'s vehicle, almost striking her person before she was able to get into her vehicle.
> . . . .
>
> 2.2.21 A preponderance of the evidence demonstrates at least five persons with relationships with [the Mother] resulting in physical violence between the two. [The Mother] was the primary aggressor in the incident that led to the assault charge against [the Father]. [The Mother] was the primary aggressor in the assault with her mother [the Grandmother] in Fall 2023.
> . . . .
>
> 2.2.24 [The Mother]'s child [R.M.A.] made statements to social workers and a law enforcement officer in May 2019 that she was fearful of returning to her home at the time that she made those statements. Those statements by [R.M.A.] are admissible evidence under the present sense impression exception to the hearsay rule. Therefore the child's fear is available for the Court to consider as evidence.
>
> 2.2.25 Expert witness [assigned as social worker in March 2023] opined that a finding of dependency is in [R.M.A.]'s best interests and that [R.M.A.] wrote on a whiteboard expressing happiness to be removed from the home.
> . . . .

> 2.2.29 Expert Guardian ad litem [] testified regarding [R.M.A.]'s fear to return home, and that it would be in the children's best interests to be found dependent.

CP at 511-12, 1053-54.

The Mother appeals.

## ANALYSIS

The Mother challenges the trial court's conclusion, in its written decision, to consider as substantive evidence some of the hearsay statements previously admitted for the limited purpose of explaining the expert's opinion. In addition, the Mother challenges numerous findings of fact, arguing that they are not supported by substantial evidence.

Specifically, the Mother contends, and the Department concedes, that substantial evidence does not support the finding that R.M.A. made statements to social workers and a law enforcement officer in May 2019, that she was fearful of returning home. The parties also agree that contrary to the court's finding, R.M.A.'s statements were not admissible evidence under the present sense impression exception to the hearsay rule. However, the Department argues the errors were not prejudicial and did not affect the outcome of the case.

No. 40431-5-III (consol. with No. 40432-3-III)
*In re the Dependency of R.M.A.*

### A. Additional facts

*The Mother's objections and the court's evidentiary rulings*

The social worker who was assigned in March 2023 testified as an expert in social work. The Mother objected to hearsay when the social worker began testifying to statements R.M.A. made. The Department defended the objection, stating the testimony was not offered for the truth of the matter but to show how the social worker formed her opinion. The court ruled:

> So as an expert witness, [the social worker] is allowed to have an opinion and she's allowed to explain how she arrived at that opinion. The testimony about what was said to her is only admitted for the purpose of explaining [her] opinion, not for the truth of the matter asserted.

RP at 81. The Department asked the social worker what R.M.A. said about whether the Father was living at home with her. The Mother objected again:

> MS. BROWN: I'm going to object again to hearsay.
> THE COURT: As long as it's going to this Witness's opinion as an expert, it's allowed. But it's not allowed for the truth of the matter asserted.
> MS. BROWN: Do you want me to keep making it every time she says [R.M.A.] said?
> THE COURT: No, because I think that's —
> MS. BROWN: Can I have a standing objection to hearsay —
> THE COURT: You may have a standing objection.

18

MS. BROWN: —that it not go to the truth of the matter asserted?

THE COURT: Yes.

RP at 82. The court instructed the social worker regarding the ruling, telling her "you may repeat it, but it's not whether or not [R.M.A.] was telling the truth. It's—what we're getting at is your opinion and why your opinion existed and how you got to that opinion." RP at 82. The Department asked, "to clarify further . . . that [the social worker] can testify to [R.M.A.]'s statements because it's leading to her conclusions." RP at 83. The court agreed.

The Mother also asked for clarification: "So I understand the Court's ruling that it is only to substantiate her expert opinion and it will not be used as substantive evidence. Is that accurate?" RP at 83-84. The court and the Department agreed. The Mother continued: "And the Court understands I have a standing objection to hearsay from this Witness that is used for anything that goes to substantive evidence." RP at 84. The court replied, "Yes. . . . I already acknowledged that." RP at 84.

At the close of evidence, the court again discussed with the parties what expert evidence the court would consider as substantive. Specifically, the parties agreed that all of R.M.A.'s statements could only be used to lend credibility to expert opinion. The court ruled that "[w]hat [R.M.A.] has said is out as substantive evidence, but it is in as far as it justifies an expert opinion." RP at 275.

*Hearsay evidence*

The court admitted the following (non-exhaustive) hearsay testimony for the limited purpose of substantiating expert opinion.

The social worker assigned in March 2023 testified that she met with R.M.A. in one of Department's offices the day R.M.A. was placed into protective custody. She stated that R.M.A. seemed really happy to be away from home. The social worker explained that there was a whiteboard in the office that other children had written negative things on. A child had written "I hate it here" and "this place sucks." RP at 95. When R.M.A. saw those negative things, she crossed off "hate" and wrote "love." RP at 95. She crossed out "sucks" and replaced it with "is awesome." RP at 95.

The court also heard hearsay testimony regarding other allegations. R.M.A. told the school that the Father choked her two years prior because she did not finish her spaghetti. The schoolteacher thought the Mother's expression of care for R.M.A. was staged and theatrical.

R.M.A. purportedly made statements that the Mother would not take her to the doctor. She also said her parents would go to the bedroom and fight; there were holes in the wall from the fighting that she covered with pillowcases, and she saw bruises on the Mother. She also reported that the Mother and Father smoked white powder; the dog once ate some off the coffee table and became ill.

One of the social worker's reported reading a concern in the Department's report that a registered sex offender was living in the Mother's home, helping her care for the children. It was believed that the temporary roommate was the Mother's cousin who had a record with the Department as a level one sex offender.

The social worker also told a story based on a report from the Mother's sister. The sister claimed that when she dropped the children off at home on a particularly cold day, the Mother was busy working on her roof. The Mother put the children in her car in the driveway while she continued working, but the car was not running so there was no heat. The sister reported that the children cried and said they did not want to return to their Mother.

*Presentment hearing*

The Department drafted and circulated proposed findings and a presentment hearing was held on April 9, 2024. The Department explained the parties reached agreement on all but one of the findings. The parties argued whether proposed finding 2.2.30 accurately reflected the court's oral ruling and applicable statutory language. The proposed finding indicated the dependency was "due to the violence in [the Mother's] life that her children have been exposed to, placing them in danger of physical and psychological damage." CP at 496. The Mother argued that the court's oral finding did not premise dependency on violence and that it only discussed psychological, not physical, development. The court stated that, "while I may have inferred it, instead of

21

directly saying it, domestic violence was definitely the reason for my finding for the [(c)]

dependency." RP at 354.

Although the parties only argued one finding at presentment, the court's final

order differed from the proposed order in nine of its findings.[3] Relevant to this appeal,

the Mother challenges two findings the court adopted verbatim from the proposed

findings:

> 2.2.24 [The Mother]'s child [R.M.A.] made statements to social workers
> and a law enforcement officer in May 2019 that she was fearful of returning
> to her home at the time that she made those statements. Those statements
> by [R.M.A.] are admissible evidence under the present sense impression
> exception to the hearsay rule. Therefore the child's fear is available for the
> Court to consider as evidence.
>
> 2.2.25 Expert witness [assigned as social worker in March 2023] opined
> that a finding of dependency is in [R.M.A.]'s best interests and that
> [R.M.A.] wrote on a whiteboard expressing happiness to be removed from
> the home.

CP at 511, 1053-12.

### B. Legal principles

The United States Constitution and the Washington Constitution provide a

fundamental liberty interest to a parent in the care and custody of their children. U.S.

CONST. amends. V, XIV; WASH. CONST. art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745,

---

[3] *Compare* CP at 495-96 (FF 2.2.12, 2.2.13, 2.2.14, 2.2.17, 2.2.22, 2.2.23, 2.2.27, 2.2.30) *with* CP at 511-12 (FF 2.2.12, 2.2.13, [2.2.14], 2.2.17, 2.2.22, 2.2.23, 2.2.26, 2.2.27, 2.2.30).

753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). This fundamental liberty interest does not evaporate simply because a parent has not been a model parent. *Santosky*, 455 U.S. at 753. This means that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020.

A "dependent child" is one who

> has no parent, guardian, or custodiam capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

RCW 13.34.030(6)(c).

We review a trial court's findings of fact to determine whether they are supported by substantial evidence. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "Substantial evidence" requires us to determine if the evidence, when viewed in the light most favorable to the prevailing party, is "sufficient to persuade a rational, fair-minded person of the truth of the finding." *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). We consider the evidence and draw inference therefrom in the light most favorable to the prevailing party. *Id*. We will not reweigh the evidence or determine witness credibility on appeal. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Unchallenged findings constitute verities on appeal. *Jones*, 152 Wn.2d at 8.

A court has broad discretion in dependency proceedings to determine whether there exists a risk of harm justifying dependency. *X.T.*, 174 Wn. App. at 737-38. Proof

of actual harm is not required; a court may rely on a danger of harm to find dependency.

*Id*. at 737.  However, "such discretion does not permit juvenile courts to disregard

evidence rules, especially where the deprivation of parental rights is involved." *Id*. at

733.

The rules of evidence apply at dependency hearings.  RCW 13.34.110(1).  Parents

"should not be deprived of their parental rights on hearsay." *In re Welfare of Ross*, 45

Wn.2d 654, 655-56, 277 P.2d 335 (1954).  Hearsay is an out-of-court statement offered to

prove the truth of the matter asserted.  ER 801(c).  Hearsay is inadmissible unless an

exception applies.  ER 802.  One such exception grants a trial court discretion to allow an

expert witness to relay hearsay statements on direct examination to explain the basis of

the expert's opinion.  ER 705; *In re Dependency of A.C.*, 1 Wn.3d 186, 192, 525 P.3d 177

(2023).  While experts such as social workers may testify to hearsay that supports their

opinion, "a judge cannot rely on that hearsay as substantive evidence." *Id*.

C.  *Error preservation*

Ordinarily, this court does not review an issue that is not preserved for appeal.

*State v. Finch*, 137 Wn.2d 792, 819-20, 975 P.2d 967 (1999).  However, this court has

discretionary authority to review an issue that was not raised in either the trial court or the

party's brief.  RAP 2.5(a); *Jones v. Stebbins*, 122 Wn.2d 471, 860 P.2d 1009 (1993).

Here, the Mother assigns error to seven findings on appeal, six of which were adopted verbatim from the proposed findings and not objected to at presentment.[4] None of the parties address error preservation in their briefing. Although the Mother failed to object at presentment, she made numerous objections at trial regarding the findings she now assigns error to. Moreover, the court granted the Mother standing hearsay objections to expert testimony regarding R.M.A.'s oral and written statements. As such, we exercise our discretion to consider the merits of her appeal.

> D. *The finding of fact that R.M.A. made statements expressing fear is not supported by substantial evidence*

In this case, the court found

> [the Mother]'s child, [R.M.A.], made statements *to social workers and a law enforcement officer in May 2019* that she was fearful of returning to her home at the time that she made those statements. Those statements by [R.M.A.] are admissible evidence under the present sense impression exception to the hearsay rule.

CP at 512, 1054 (emphasis added). The parties agree the record does not support this finding as written.

First, there is no evidence of any statement made by R.M.A. in May 2019. The Department's only involvement with the family in 2019 was in August when J.A.C. was born. The social worker assigned by the Department to investigate the 2019 allegations

---

[4] The Mother assigns error to finding 2.2.30, which she objected to at the presentment hearing.

did not testify to having any interactions with R.M.A.  Instead, she testified to her interview with the Mother.  The Department's investigator stated that J.A.C. and the Grandmother were present during the conversation, but did not mention R.M.A.

Second, there is no evidence of any statement made by R.M.A. to a law enforcement officer expressing fear of returning home.  The record indicates that the only law enforcement officer R.M.A. made statements to was the detective who placed the children in protective custody.  However, the detective did not relay any statements that indicated or inferred fear in his testimony.  Nor did he conclude or suggest that R.M.A. seemed fearful.  Instead, the detective decided protective custody was appropriate because of concerns regarding drug use, alleged violations of the no contact order, and the fact that he did not have probable cause to arrest the Father for violating the no contact order.  Expressions or impressions of fear were not a factor.

Finally, the record does not indicate that R.M.A. made statements expressing fear to multiple social workers.  Instead, only the social worker assigned in March 2023 relayed statements made by R.M.A. indicating fear.  The record also does not support the finding that R.M.A. was fearful at the time those statements were made.  The social worker testified that R.M.A. was fearful of the Father because of an incident that occurred two years prior and based on her belief that he was hurting her Mother.  She also noted generally, based on her interactions with R.M.A., that "it was very clear that— that something was wrong at home and that she was fearful to go home."  RP at 94.

26

Because of these discrepancies, a rational trier of fact could not be persuaded that R.M.A. made statements to social workers and a law enforcement officer in May 2019 that she was fearful of returning to her home at the time that she made those statements. Thus, the finding is not supported by substantial evidence.

Nevertheless, the parties argue the merits of admissibility and hearsay exceptions, causing each to speculate as to which of R.M.A.'s statements the court is referring to. However, the discrepancies between the finding and the record are numerous and significant as discussed above. As such, we decline to entertain further review of this issue. *See Turner v. Creech*, 58 Wash. 439, 442, 108 P. 1084 (1910) ("This court cannot, and it should not be put to the burden of winnowing out, recasting, or rewriting the findings of trial courts in order to harmonize them so that we may follow the theory of the trial judge.").

> E. *The court abused its discretion by finding R.M.A.'s statements admissible under the present sense impression*

We review evidentiary rulings for abuse of discretion. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Id.* An abuse of discretion also occurs when the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law. *Id.*

For several reasons the trial court abused its discretion when it found that R.M.A.'s statements were admissible as substantive evidence under the present sense impression expression to hearsay.

First, the parties agree that the present sense impression exception does not apply to R.M.A.'s statements.[5] The exception applies to "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1). A review of the record is consistent with the parties' assertion that R.M.A. did not make such statements. As such, the court misapplied the law; in doing so, it abused its discretion.

Second, the court abused its discretion because it relied on unsupported facts. It attempted to apply a hearsay exception to R.M.A.'s statements expressing fear. However, the existence of those statements is unsupported, as discussed above.

Finally, it was untenable for the court to find R.M.A.'s statements admissible after consistently ruling to the contrary at trial. "If the trial court has made a definite, final ruling, on the record, the parties should be entitled to rely on that ruling." *State v. Powell*, 126 Wn.2d 244, 893 P.2d 615 (1995) (quoting *State v. Koloske*, 100 Wn.2d 889, 896, 676 P.2d 456 (1984)).

---

[5] The Department states that "[s]ua sponte in its ruling, the trial court determined these statements were admissible as present sense impressions." Resp't's Br. at 34-35. Whether the court acted sua sponte is questionable given that the court used the exact language in the Department's proposed findings.

Throughout trial, the Mother objected to statements made by R.M.A. and others as inadmissible hearsay, and the court ruled that hearsay statements were allowed to explain the basis of an expert's opinion but were not admissible as substantive evidence. At the close of evidence, the court again confirmed with the parties what expert evidence the court would consider as substantive. The Mother's counsel addressed the court:

> I objected and I consistently for every witness and the Court seemed to lose its temper with me when I repeatedly tried to object and so it was deemed that for each witness that I objected to the hearsay coming in, there was a standing objection for their testimony. That was my understanding of the Court's ruling.

RP at 273. The court replied,

> I think you're confused about the word standing. Standing means you don't have to continue to make the objection. Standing means the objection is made and continues ongoing during this witness's testimony. . . . The Court was frustrated yesterday that you continued to object after I allowed you to have a standing objection.

RP at 273-74. Each of the court's evidentiary rulings throughout trial were definite, final rulings on the record.

And if there was any doubt as to finality, the parties explicitly agreed that all of R.M.A.'s statements could only be used to lend credibility to expert opinion. As such, the court affirmed that "[w]hat [R.M.A.] has said is out as substantive evidence, but it is in as far as it justifies an expert opinion." RP at 275.

Notwithstanding its evidentiary rulings made at trial, the trial court made findings admitting R.M.A.'s statements for the truth of the matter asserted. In doing so, it deprived the Mother an opportunity to challenge the truth of the statements through cross-examination. *See Hickok-Knight v. Wal-Mart Stores, Inc.*, 170 Wn. App. 279, 284 P.3d 749 (2012) ("Evidence is tested by the adversarial process within the crucible of cross-examination, and adverse parties are permitted to present other challenging evidence."). Thus, the findings that contradicted the court's evidentiary rulings were made on untenable grounds. The court abused its discretion.

### F. *The court erred when it concluded it could consider the child's fear*

A determination is a conclusion of law if it requires legal reasoning from, or interpretation of, evidentiary facts. *Goodeill v. Madison Real Estate*, 191 Wn. App. 88, 99, 362 P.3d 302 (2015). Conclusions of law that are mislabeled as findings of fact are reviewed as conclusions of law. *Id*. We review the trial court's conclusions of law de novo. *Id*. "The court's conclusions of law must be supported by its findings of fact." *State v. Veltri*, 136 Wn. App. 818, 821, 150 P.3d 1178 (2007).

Here, the court made a finding of fact that "[R.M.A.] made statements . . . that she was fearful of returning to her home at the time that she made those statements." CP at 512, 1054. Then, the court reasoned that "[t]hose statements by [R.M.A.] are admissible evidence under the present sense impression exception to the hearsay rule." CP at 512, 1054. Finally, it determined: "Therefore the child's fear is available for the Court to

consider as evidence."  CP at 512, 1054.  Because the court's conclusion finds its support

in an erroneous and unsupported finding of fact, the conclusion cannot stand.

G. *The error is prejudicial and warrants reversal*[6]

An evidentiary error is not grounds for reversal unless it resulted in prejudice.

*State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).  And an evidentiary error

is "not prejudicial unless, within reasonable probabilities, the outcome of the trial would

have been materially affected had the error not occurred." *X.T.*, 174 Wn. App. at 739

(quoting *Bourgeois*, 133 Wn.2d at 403).

Here, there is a reasonable probability that the outcome of the trial was materially

affected by the court's admission of R.M.A.'s statements as substantive evidence and

conclusion that "the child's fear is available for the Court to consider as evidence."  CP at

512, 1054.

First, the court would have little reason to reanalyze its final evidentiary rulings,

contemplate an applicable exception to hearsay, and make findings contradictory to its

earlier rulings, if not to materially affect the outcome of the case.  Additionally, a child's

fear is an important and significant factor.  In fact, the court found that "[a] child is

---

[6] The Mother fails to argue that the court's erroneous admission of evidence
materially affected the trial.  Instead, she conflates the two relevant legal standards and
claims she was prejudiced because substantial evidence does not support the finding of
dependency absent the unsupported findings and inadmissible hearsay.  *See* Appellant's
Br. at 41-45; *see also A.C.*, 1 Wn.3d at 194-95 (distinguishing the substantial evidence
and materially affected standards of review).

psychologically harmed or placed in fear by observing violence against a family member, and being exposed to domestic violence on loved ones harms a child physically and psychologically." CP at 512, 1054; *see also Rodriguez v. Zavala*, 188 Wn.2d 586, 597, 398 P.3d 1071 (2017) (noting "a child's fear for a parent brought about by witnessing one parent assault the other is a psychological harm that qualifies as domestic violence and is a statutory basis for a protection order").

The Department argues that the court's erroneous findings did not have a material effect on the outcome of the trial. It argues the errors only arose after the record had closed and were minor in comparison to the remaining evidence; this was not a widespread error that infected the evidence as a whole. This argument is unpersuasive.

Errors arising after the record closed deprived the parties of their ability to further develop testimony and evidence that the court ultimately considered for its truth. The Mother had no reason to cross-examine experts regarding the merits of the evidence eventually used to establish R.M.A.'s alleged fear. Additionally, it is impossible to ascertain the extent of R.M.A.'s statements the court admitted and considered in its dependency finding because of the discrepancies between the finding and the record. It cannot be determined whether the court limited its consideration to statements expressing fear, or statements made to certain parties. For instance, the court found R.M.A. made statements expressing fear to the GAL—evidence it previously ruled could not be used

substantively. The court's consideration of R.M.A.'s fear is not contained to the challenged findings.

The Department further contends that any error is harmless because R.M.A.'s statements were admissible as substantive evidence under a then-existing state of mind hearsay exception. R.M.A. contends this theory also applies to the admissibility of R.M.A.'s whiteboard statement. The argument fails for two reasons.

The parties ask this court to perform a de novo analysis as to whether R.M.A.'s oral or written statements could have been admitted under a hearsay exception in the first place. But the parties agreed that the court would not consider R.M.A.'s statements for their truth. And "[a] party is not permitted to maintain inconsistent positions in judicial proceedings" or "assert a theory on appeal different from that presented on the trial level." *Mueller v. Garske*, 1 Wn. App. 406, 409, 461 P.2d 886 (1969) (explaining this as "a rule of procedure based on manifest justice and on a consideration of orderliness, regularity and expedition in litigation"). Thus, these arguments were waived.

Second, it is impossible to analyze whether the then-existing state of mind exception applies to R.M.A.'s oral statements because the finding establishing the existence of such statements is unsupported. There is no way for this court to determine which of R.M.A.'s statements would be subject to analysis.

The court erred when it relied on R.M.A.'s hearsay statements and considered her alleged fear. The error was prejudicial. Under the materially affected standard, "if a

different outcome was reasonably probable without the error, then the error had a material effect and the judgment should be reversed." *A.C.*, 1 Wn.3d at 195.

The Mother raises additional argument but asks for the same relief: that the errors require reversal of the order of dependency. Because we grant the relief requested, we decline to address the remaining issues.

We reverse the order of dependency and remand for additional proceedings consistent with this decision.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Murphy, J.